NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2989-18T1

THE ESTATE OF FRANK A.
CAMPAGNA and THE HEIRS
OF THE ESTATE OF FRANK
A. CAMPAGNA by CHRISTINE
CAMPAGNA, as Administratrix
Ad Prosequendum of the Estate
of FRANK A. CAMPAGNA,

     Plaintiffs-Appellants,

v.

PLEASANT POINT PROPERTIES,
LLC, and PATRICIA DALTON a/k/a
PATRICIA DALTON GOLDSMITH
a/k/a PATRICIA GOLDSMITH,

     Defendants-Respondents,

and

PLEASANT POINT PROPERTIES,
LLC,

     Defendant-Respondent/
     Third-Party Plaintiff,

v.

BROUWER HANSEN & ISDEBSKI
ASSOCIATES, and ANTHONY
STRONG,

> **APPROVED FOR PUBLICATION**
>
> **June 17, 2020**
>
> **APPELLATE DIVISION**

Third-Party Defendants.
_____

Argued telephonically April 20, 2020 –
Decided June 17, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law
Division, Ocean County, Docket No. L-2889-16.

James A. Maggs argued the cause for appellants
(Maggs & McDermott, LLC, attorneys; James A.
Maggs, of counsel; Victoria J. Adornetto, on the briefs).

Ryan Milun argued the cause for respondents (The
Killian Firm, PC, attorneys; Ryan Milun, of counsel
and on the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This wrongful death and survival case arises out of the fatal stabbing of a rooming house resident by another resident. The assailant had recently been released from prison after serving a sentence for a violent crime, although the rooming house owner and operator were not aware of that criminal history.

The core question in this case is whether, under New Jersey statutory or common law, a rooming house operator has a legal duty to conduct a criminal background check of prospective residents to promote the safety of other

2

rooming house residents. The trial court found no such duty exists or should be adopted, and therefore granted summary judgment to defendants.

We affirm. The trial court appropriately rejected plaintiffs' claim of duty. No such duty is set forth in or implied by our State's rooming house statutes and regulations, and no other state court has adopted one. As we will discuss, the alleged duty could have problematic and substantial public policy ramifications.

I.

We summarize the facts from the motion record, viewing them as we must in a light most favorable to plaintiffs. R. 4:46-2; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Background Concerning the Rooming House

The murder victim, Frank A. Campagna, was a resident of a rooming house in Point Pleasant Beach. The facility is a "Class A" licensed rooming house, consisting of two stories with twelve rooms and three apartments. The first floor of the dwelling has two rooms. The second floor has resident rooms, a kitchen, a laundry, and a shared single-occupancy bathroom. There is no designated common area within the building where residents congregate.

The owner of the rooming house is defendant Pleasant Point Properties, LLC ("the LLC"). Co-defendant Patricia Dalton is the sole member of the LLC.

A-2989-18T1

As the LLC's principal, Dalton is responsible for various administrative functions. Those functions include the payment of taxes, insurance premiums, utility bills, and the mortgage; ensuring that the building is compliant with state statutes and regulations; and arranging for necessary repairs.

The rooming house is licensed by the State pursuant to the Rooming and Boarding House Act of 1979 ("the RBHA"), N.J.S.A. 55:13B-1 to -21.[1] The RBHA requires that every rooming house have a licensed operator, a person who resides there and who is responsible for "daily operation" of the rooming house. N.J.S.A. 55:13B-3, -8. If the operator either resigns or is otherwise unavailable to perform the duties associated with the position, "then the primary owner shall be deemed to be the operator of the facility until such time as the commissioner is notified of the appointment of a new operator, and shall have the same responsibilities . . . ." N.J.S.A. 55:13B-8.

According to Dalton, the operator (sometimes referred to as a "manager" by the parties) is responsible for on-site tasks such as collecting rent, showing

---

[1] The RBHA requires all rooming house owners to hold a valid license, issued annually by the Commissioner of the Department of Community Affairs ("DCA"). N.J.S.A 55:13B-7; N.J.A.C. 5:27-1.6. Rooming houses differ from boarding houses in that they do not provide residents with "personal or financial services." N.J.S.A. 55:13B-3(h).

A-2989-18T1

vacant rooms to prospective residents, cleaning certain areas and sidewalks, ensuring the heat and mechanical systems are working, and acting as a liaison between the residents and the owner.

The Managerial Transition from Mahaffy to McMaster

Kenneth Mahaffy was the licensed operator at the rooming house beginning sometime in 2011 through August 2015. There is conflicting testimony in the record about when Mahaffy's successor, Daniel McMaster, took over as operator.

Dalton testified that McMaster began serving as the acting operator in September 2015, though he was not licensed by the DCA until November 2015. McMaster had lived at the rooming house for approximately six months and was already familiar with day-to-day operations. Before Mahaffy left, Dalton met with him and McMaster to go over McMaster's responsibilities and told McMaster that she was available by phone if he had questions.

Dalton notified the residents at the end of August 2015 that McMaster would be assuming the responsibilities of operator and asked them to pay him their rent due on September 1, 2015. She recalled that she started paying McMaster in September or October 2015. However, she claimed that she waited until November 2015 to obtain a new operator license for the rooming house

5

because McMaster was working "on a trial basis," and Mahaffy's license was valid until March 2016.

McMaster initially testified that he was serving as "acting manager" in October 2015, but then changed his testimony and said that he "took over" in November 2015. Contrary to Dalton's testimony, McMaster denied being the operator at the time of the murder in October 2015. He said that he moved into the designated apartment for the operator at the end of October 2015. He denied receiving any training prior to becoming the operator but said that Mahaffy had shown him where the boiler, main power supply, and keys were located. He said that the first time he received any compensation from the LLC, in the form of a reduction in rent, was in November 2015, after the murder.

Anthony Strong's Rental Application

The resident who killed Campagna was Anthony Strong. Strong had been living at the rooming house for several weeks leading up to the murder.

The record contains an undated copy of Strong's rental application. The application listed his name, address, social security number, phone number, and contact information for his housing worker and social worker. The application stated that Strong had no prior rental history and the employment history section was incomplete. The following words were handwritten by an unidentified

6

person over the employment history section: "On general assistance—guaranteed rental payments."

Dalton testified that Strong's application was submitted in either July or August 2015. She recalled that Karen Tubertini, another resident, had referred Strong to her, and that Strong was Tubertini's daughter's boyfriend.

Strong had frequently visited Tubertini at the rooming house for approximately six months before he became a resident. Tubertini told Dalton that Strong did "odd jobs" and "would be covered for rent" through a subsidy from the Ocean County Board of Social Services ("OCBSS").

Dalton called OCBSS at the end of August 2015 to verify Strong's eligibility for a rent subsidy but was told that his matter was still being processed. Even though she had not obtained confirmation that she would receive rental payments from OCBSS, Dalton gave Strong a key to a room and allowed him to move into the rooming house during the first week of September 2015. Dalton expected to receive back payments from OCBSS once Strong was approved for the rent subsidy, as the process could sometimes take two or three months. Ultimately, she never received any rental payments from OCBSS.

Dalton admitted that she never met or interviewed Strong before he moved into the rooming house. She did not inquire about his rental history,

employment history, medical history, or background. Dalton insisted that neither she nor the operator was required to conduct criminal background checks of prospective residents, and that it was not her practice to do so in 2015. According to Dalton, she "never had an incident" at the rooming house in fifteen years and it had not occurred to her that background checks were necessary. Dalton stated that, as of the summer of 2015, she did not know whether any of her residents had criminal histories or psychiatric issues.

Dalton and McMaster agree that McMaster was not involved with Strong's rental application. McMaster said that Dalton told him that Strong had a key so he could "put some of his belongings" in the room while his rental application was pending. According to McMaster, he was unaware that Strong had begun living there, though he had seen him in the laundry room with his girlfriend and near Tubertini's apartment. He thought that Strong "looked like a nice kid" and described him as "very respectful."

The Murder

Just before midnight on October 7, 2015, McMaster and another resident, Edward Hurd, heard noise coming from Campagna's apartment that sounded like a fight. McMaster knocked on Campagna's door and a voice responded,

"Alright" and "I'm sleeping." Hurd believed that the responding voice was not Campagna's and called 9-1-1.

The police arrived just as Strong left Campagna's apartment, where Campagna's body was discovered. Strong's clothing was covered in blood. Strong was crying and said: "[H]e was coming at me; there was nothing I could do."

Strong told police that he and Campagna were watching television and drinking vodka when Campagna got mad and punched him. Strong then grabbed a knife from a table in Campagna's room and stabbed him.

Tubertini told police that the knife recovered from the murder scene belonged to Strong, and that Strong had shown it to her about a month earlier. Michael Colon, a facilities evaluator from DCA, visited the rooming house after the murder and found "no signs of force[d] entry" on Campagna's bedroom door.

Strong pled guilty to murdering Campagna by stabbing him ninety times until he was "satisfied that he was dead." He is currently serving a thirty-year prison sentence.

At his plea hearing, Strong testified that Campagna knocked on his door the night of the murder and invited him to "party." They went to a liquor store where Campagna purchased a bottle of vodka. Thereafter, they returned to

Campagna's room, shared a "blunt" containing marijuana, watched a football game, and a "verbal heated argument ensued" which led to the stabbing.

Other Deposition Testimony

Eight residents of the rooming house, including McMaster, gave deposition testimony about Campagna and Strong. One resident, Judith Broderick, testified that Campagna and Strong would regularly "hang out" in Campagna's room to watch football or listen to music, and would also go out walking together. She also recalled that Strong had attended Campagna's birthday party at the rooming house the day before the murder. McMaster testified that he had seen Campagna and Strong smoking cigarettes in front of the rooming house once or twice before.

Another resident, Larry Massa, suspected that Strong was responsible for slashing Campagna's bike tires as the two men "didn't see eye-to-eye." He testified that Campagna and Strong were not "buddy[-]buddy," that they did not spend time together, and that he would not have expected Campagna to invite Strong into his room. Massa said that Strong was "a little scary" and "didn't think he was good business." Campagna's mother, Christine Campagna, and his sister, Michelle Decline, testified that Campagna had never mentioned Strong to them.

A-2989-18T1

Broderick and Massa testified that they had seen Strong with a knife at the rooming house. Broderick said that Strong "always carried" a knife with him. Massa said that he saw Strong with a knife in his back pocket and had also seen Strong "throwing the knife in the dirt." By contrast, McMaster and two other residents, Hurd and Deborah Germak, testified that they had never seen Strong with a knife.

Both Broderick and Massa knew that Strong had been in jail, and Massa said he had seen Strong's parole officer visit him. Germak testified that Strong boarded a van in the mornings as part of his parole.[2]

Strong had been previously convicted of an armed robbery that occurred in 2009. He pled guilty to "beating and robbing an 80-year old man in an Atlantic City casino restroom," and was sentenced to a five-year prison term.

Broderick and Massa testified that Dalton visited about once a month. Another resident, Audrey Crinigan, testified that she saw Dalton "sometimes" and would say hello. Kevin Napalo, a resident since 2010, testified that he had never met Dalton until after the murder.

---

[2] The parties agree that an entry in a police report stating that Strong had been released under the Intensive Supervision Program ("ISP") is incorrect. Given the nature of Strong's prior criminal record, he does not appear to have been eligible for ISP.

A-2989-18T1

Dalton testified that Campagna had lived at the rooming house since December 2007. She spoke with him at the rooming house on at least three occasions in September 2015, and said that he "was chatty and seemed very content." She denied that he had ever "indicated or suggested that he had any concerns for his safety or any problems with any tenants."

Dalton testified that none of the residents had ever informed her that they were having issues with Strong. None of the residents who were deposed testified that they had ever complained to either McMaster or Dalton about Strong.

Dalton said she was unaware of any prior physical confrontations or violent crimes at the rooming house but admitted that she did not have procedures in place to document complaints received from residents.

McMaster testified that, since the murder, some "checks" of prospective residents are done by an online service. However, he did not know what the checks entailed, or whether they were criminal background checks. He denied knowing whether any of the rooming house residents had a criminal record. He said that Dalton has rejected applicants at least twice since he became the operator.

Plaintiffs' Lawsuit

In October 2016, Campagna's Estate filed a five-count complaint against the LLC. Counts one and two alleged negligence and gross negligence. Count three alleged violations of the RBHA and a related regulation, N.J.A.C. 5:27-3.3. Count four was a survival action and count five alleged wrongful death.

The Estate subsequently amended the complaint to allege an "occurrence causing bodily injury during policy period and on insured premises." Later, the Estate amended the complaint again to name Dalton as a co-defendant.

The LLC and Dalton denied liability. The LLC filed a third-party complaint against its insurance broker for coverage, alleging professional negligence and breach of contract. The insurance claims were severed.[3]

The LLC and Dalton also named Strong as a third-party defendant. Strong never filed an answer. Plaintiffs did not name Strong as a direct defendant.

Plaintiffs' Expert Report

Plaintiffs retained a liability expert, who rendered a report in support of their theories of negligence on the part of the LLC and Dalton. The expert is a Certified Property Manager ("CPM") and Professional Community Association

---

[3] The insurance claims were dismissed by stipulation without prejudice.

 A-2989-18T1

Manager ("PCAM"). He holds a Master's degree in public administration from New York University. According to his report, the expert has worked in real estate management since 1981 and now serves as an independent consultant to real estate owners and managers. He has also served on the boards of state and national property management organizations.[4]

The expert reviewed case-related documents including discovery responses, depositions, investigative reports pertaining to Strong and Tubertini's criminal histories,[5] as well as documents published by the Institute of Resource Management pertaining to industry best practices. He also reviewed the RBHA and related regulations.

The expert opined that management of the rooming house by the LLC and Dalton constituted "incompetence [that] put the safety and security of all residents at the property at risk" and "was a proximate cause of Mr. Campagna's savage injuries and violent death."

---

[4] Defendants have not challenged the expert's qualifications, although they do contend his report contains inadmissible net opinions. We do not need to reach that evidence issue and have fully considered the substance of the expert's report.

[5] In 2008, Tubertini pled guilty to attempted murder for poisoning her husband and was sentenced to a five-year prison term.

A-2989-18T1

The expert asserted that Dalton had violated the RBHA because the rooming house did not have a licensed operator on October 7, 2015, and she failed to comply with the statute's mandate that the owner act as operator until a new operator is appointed. He also contended that Dalton violated a DCA regulation, N.J.A.C. 5:27-8.1, which requires mandatory record-keeping and "maintenance of a file for every resident." The expert stated Dalton was "incompetent" in this regard, as she acknowledged that she did not keep any records.

In addition, the expert cited various industry publications that describe a property owner and manager's responsibility to provide residents and visitors "with a safe environment" and to "minimize safety risks on the premises." He opined that Dalton ignored "the high priority that the housing industry places on the safety and security of residents" by failing to conduct a criminal background check of Strong, "thereby permitt[ing] an individual with entirely unknown propensities and history to occupy a room" and "demonstrating lack of care or concern for the protection of current residents from a potentially unscrupulous new neighbor."

The expert criticized Dalton for relying solely upon Tubertini's recommendation of Strong's application, as Tubertini herself "had a violent

criminal record." He found this contravened statutory and regulatory requirements, as well as industry standards.

With respect to background checks, the expert asserted that "[i]t is standard industry practice in the property management field to perform background checks as an integral part of the tenant application process" which includes checking "credit reports, landlord/tenant history and criminal background." He noted that landlords typically use third-party vendors with "proprietary software" that "ensure compliance with state laws." He further opined that "criminal background [conviction] checks are permitted in New Jersey" and under federal law, so long as the checks are not discriminatory in nature.

The expert concluded that the LLC "had no appropriate screening of potential residents in place." Moreover, he concluded that "basic Google searches" of Strong and Tubertini would have revealed their violent criminal backgrounds.

The expert opined that the LLC should never have given Strong a key and permission to reside at the rooming house as he had not been "appropriately screened" and his application was still "in process." Had the LLC screened Strong, "the nature and extent of his violent criminal background would have

 A-2989-18T1

been discovered," and, in the expert's opinion, the LLC should have then rejected his application for residency "in fulfillment of statutory requirements, regulatory obligations and consistent with industry standards to protect the health, safety, and welfare of all who reside there."  Doing this allegedly would have deprived Strong "of the access and opportunity to engage in the violent and fatal attack on Frank Campagna inside [his] personal room of residence."

Summary Judgment Motions

After the completion of discovery, defendants moved for summary judgment.  Their main contention was that this State has not recognized—either in codified provisions or the common law—a legal duty of a rooming house owner or operator to perform criminal background checks about prospective residents.

The motion judge was supplied with extensive materials from the record, including Strong's application form and other pertinent documents, deposition testimony, and plaintiffs' expert report.  The motion judge also heard oral argument.

The Court's Decision

The trial court granted summary judgment to defendants.  In a thirteen-page written opinion, issued by Judge James Den Uyl, the court made findings

17

pertaining to both Dalton and the LLC.  The court also cited case law pertaining to common-law negligence, as well as a landlord's general "legal duty to take reasonable security measures for tenant protection."

The court recognized that, as a general proposition, "a landlord's duty to protect [a] tenant from foreseeable criminal acts of [a] third party applies when [the] third party is [a] co-tenant."  But ultimately the court found that the evidence was "so one-sided that it does not require submission to a jury" and that defendants were entitled to judgment as a matter of law.

The court noted that the there was "no specific statutory authority cited" that required the LLC to conduct background checks of prospective residents. Furthermore, even if such a duty hypothetically existed, and the LLC had conducted a background check of Strong, the LLC "may have decided within its discretion to rent the vacant room to Strong, especially as he was recommended by a current tenant and he had been deemed to be safe to release into the community by the parole board."

Moving on to common-law principles, the court also found that "there is no competent evidence from which a jury could reasonably infer that the incident was foreseeable or that any alleged acts or omission by Defendants were a proximate cause of the stabbing."

The court underscored that even before Strong was given a key to the rooming house, he had been visiting the property for six months. The court also noted that "Strong frequently engaged in social activities with Campagna in and around the rooming house." The court observed that the LLC "cannot control the actions of its tenants and their unilateral decisions to associate with fellow tenants." In this regard, the court found that, at the time of the murder, "Strong was a social guest in Mr. Campagna's apartment."

This appeal ensued.

II.

The specific issues of legal duty posed to us are novel. Even so, certain general principles of law frame our discussion.

Plaintiffs' allegations of fault are fundamentally claims of negligence. "[A] negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013).

Our focus is on the first required element: the presence of a legal duty. The existence and scope of a duty is a legal question for the court. Broach-Butts v. Therapeutic Alternatives, Inc., 456 N.J. Super. 25 (App. Div. 2018), certif.

19

denied, 236 N.J. 606 (2019). We review the trial court's determination of that question de novo. Id. at 33.

We are not bound by the opinion of plaintiffs' expert that the recognition of such a duty is legally required because it is reflective of industry practices and customs. "An expert's opinion on a question of law is neither appropriate nor probative." Kamienski v. State, 451 N.J. Super. 499, 518 (App. Div. 2017). "It is the exclusive province of the court to decide questions of law, such as the interpretation of a statute." Ibid. (citation omitted).

Here, plaintiffs and their expert contend that defendants breached duties owed under both statutory law (as reflected in the RBHA and its regulations) and the common law. We concur with the trial court that the specific duties espoused by plaintiffs[6] are not codified in the RBHA or its regulations. Nor are

---

[6] On appeal, plaintiffs expanded their focus beyond a duty to conduct background checks, further arguing that defendants breached a duty to maintain greater security measures on site and a duty to disclose a new resident's violent history to other residents. The first alleged duty is not elaborated in the expert report with any specific recommended security protections, and the latter alleged duty is not mentioned at all. In any event, we discern no legal or factual basis to reverse summary judgment on these grounds. The central thrust and premise of this case is about screening of applicants that allegedly would have revealed Strong's violent background. The claim of inadequate security presumes that such screening is required and would have alerted defendants to Strong's dangerousness. In addition, as we will discuss, infra, the adoption of a novel legal duty to inform other residents of a new resident's criminal history implicates troublesome public policy and privacy concerns.

A-2989-18T1

or should such asserted duties be recognized by this court as a basis for tort liability under the common law.

A.

(Whether a Statutory Duty Exists Under the RBHA)

We begin with an examination of the rooming house statute and its associated regulations.

The RBHA "was enacted in response to a number of deadly boarding home fires which focused public attention on the unsafe and unsanitary conditions" in many rooming and boarding houses. Salvation Army v. Dep't of Cmty. Affairs, 919 F.2d 183, 186 (3d Cir. 1990) (citing Market St. Mission v. Bureau of Rooming & Boarding House Standards, 110 N.J. 335, 341 (1988)). As written, the statute "goes far beyond this initial motivation to ensure fire safety and safeguard the health of the residents . . . ." Ibid.

N.J.S.A. 55:13B-2, the RBHA's preamble, states that the Legislature "finds and declares," among other things, that: (1) "[n]umerous citizens of this State reside in rooming and boarding houses which are either infrequently supervised or completely unsupervised, unlicensed and unregulated by the State"; (2) "residents of such facilities are predominantly elderly, disabled and poor, many of whom need social, personal and financial services, protection

A-2989-18T1

from building hazards and protection from unscrupulous and predatory neighbors"; and (3) "[t]his remedial legislation is therefore necessary to provide for the health, safety and welfare of all those who reside in rooming and boarding houses in this State . . . ."

Towards that end, N.J.S.A. 55:13B-6 requires the DCA Commissioner to "establish standards to ensure that every rooming . . . house . . . is . . . operated in such a manner as will protect the health, safety and welfare of its residents and at the same time preserve and promote a homelike atmosphere appropriate to such facilities . . . ." Those standards include, but are not limited to: "[p]hysical security," "[r]easonable access for other citizens upon receiving the consent of the resident to be visited by them," and "[o]pportunity for each resident to live with as much independence, autonomy, and interaction with the surrounding community as the resident is capable of doing." N.J.S.A. 55:13B-6(d), (l), and (m).

State regulations at N.J.A.C. 5:27-1.1 to -14.1 amplify these broad standards in more detail, including those related to building security and resident rights. The Bureau of Rooming and Boarding House Standards ("Bureau") within the DCA's Division of Codes and Standards is responsible for

enforcement of the Act and its regulations. <u>Salvation Army</u>, 919 F.2d at 187; N.J.A.C. 5:27-1.3(a), -2.1.

The regulations require licensees to "establish reasonable rules governing the conduct of persons within the rooming . . . house" that "shall include provisions to ensure that residents exercise their rights in such a way as not to infringe upon the rights of or endanger other residents."  N.J.A.C. 5:27-3.2(a), (b).[7]  The RBHA and its regulations also contain a resident's Bill of Rights, which grants residents "unrestricted communication, including personal visitation with any person of his choice, at any reasonable hour" and "a safe and decent living environment . . . ."  N.J.S.A. 55:13B-17, -19(i) and (l), -3.1.

Plaintiffs contend that "[d]efendants' violations of statutory and regulatory duties are evidential of [d]efendants' negligence and liability for Campagna's resultant damages."[8]  They assert that defendants committed two violations of the RBHA and its regulations by not having a manager with a valid license on site and by not maintaining proper records.

---

[7]  The regulations appear to refer to rooming house owners as licensees, though the term "licensee" is not specifically defined in the RBHA.

[8]  After the appeal was briefed by private counsel, we invited the Attorney General and the DCA to participate as amicus curiae to address the interpretation of the rooming house statute and regulations.  They declined the invitation.

We agree with the trial court that neither the plain language of the RBHA nor its regulations require rooming house owners to conduct criminal background checks of prospective residents. For that reason, plaintiffs' contention that there was a statutory duty to conduct such checks is unavailing.

"The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)). "Whether construing a statute or a regulation, it is not [the court's] function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'" U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012) (quoting DiProspero, 183 N.J. at 492). A reviewing court "cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment.'" DiProspero, 183 N.J. at 492 (quoting Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230 (1952)).

We appreciate that the RBHA and its regulations emphasize that resident safety is a paramount overall objective. Even so, the terms of those codified provisions do not specify that rooming house owners must conduct criminal

background checks of prospective residents as a means to achieve such resident safety.

Plaintiffs cite nothing from the RBHA's legislative history to support their position that the statute mandates background checks, and our own research has not found any support for plaintiff's position. See generally Gary D. Gordon & David P. Lazarus, New Jersey's Rooming and Boarding House Act: Its Effects and Effectiveness, 12 Seton Hall L. Rev. 484, 504 (1982) (containing a detailed analysis of the statute, but making no mention of a duty to perform background checks).

Notably, the DCA regulations do address the significance of a prospective owner or operator's criminal history. Owners and operators who apply for licenses must disclose any criminal convictions on their applications. N.J.A.C. 5:27-1.7(a)(7). As delineated in the regulations, proprietors can be denied a license if they have been convicted of certain crimes:

> Except as otherwise provided in the Rehabilitated Convicted Offenders Act (N.J.S.A. 2A:168A-1 et seq.), no license shall be issued to any person who has at any time been convicted of forgery, embezzlement, obtaining money under false pretenses, extortion, criminal conspiracy to defraud, crimes against the person or other like offense or offenses, or to any partnership of which such person is a member, or to any association or corporation of which said person is an officer, director or employee or in which as a

> stockholder such person has or exercises a controlling interest either directly or indirectly.
>
> [N.J.A.C. 5:27-1.6(e).]

"When assessing a regulation's intent, '[t]he same rules of construction that apply to the interpretation of statutes guide our interpretation of regulations.'" J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 216 (2019) (quoting Headen v. Jersey City Bd. of Educ., 212 N.J. 437, 451 (2012)). If a regulation includes particular language in one section but omits it in another, "it is generally presumed that [the state agency] acts intentionally and purposely in the disparate inclusion or exclusion." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 148 (2018) (quoting DYFS v. A.L., 213 N.J. 1, 21 (2013)).

The fact that the regulations make a prospective owner or operator's criminal history a basis to deny licensure—but do not contain any comparable provisions about the significance of a prospective resident's criminal history—signifies that no codified duty to perform criminal background checks of prospective residents exists, or was intended by the drafters. See, e.g., J.H., 239 N.J. at 215 (observing, in a different context of an asserted duty, "[h]ad the DCA determined that radiators required covering, the agency possessed the knowledge and expertise to include them in N.J.A.C. 5:10-14.3(d)'s language, and could have very easily done so.").

Nonetheless, plaintiffs argue that defendants committed two statutory and regulatory violations, and that those violations constitute negligence that creates liability for Campagna's tragic death.

First, plaintiffs stress that defendants admit that McMaster did not obtain an operator license from DCA until November 2015. Thus, the rooming house lacked a licensed operator from August 2015, when Mahaffy left, until November 2015, in violation of N.J.S.A. 55:13B-3 and N.J.S.A. 55:13B-8, even though McMaster was living on the premises and had collected rent payments from residents at Dalton's direction since September 2015.

Second, plaintiffs highlight that Dalton admits she did not maintain records related to the residents, which violates N.J.A.C. 5:27-8.1 (requiring licensees "to maintain an orderly file with respect to each resident" that includes dates of occupancy, along with contact information for the person who referred the resident, the resident's primary physician, and his next-of-kin).

That said, N.J.A.C. 5:27-1.2(b) states that the Bureau "shall have discretion not to enforce any standard hereby established if it determines that strict compliance with such standard is not necessary in a particular case in order to accomplish" the Legislative purpose described in the RBHA's preamble. There is nothing in the record to establish that the DCA ever exercised such

discretion and penalized defendants for these apparent violations, or even checked for compliance.

Furthermore, while these apparent violations are surely troubling, they are neither material to the question of whether defendants had a statutory duty to conduct a criminal background check of Strong, nor "causally related" to the murder. See Badalamenti v. Simpkiss, 422 N.J. Super. 86, 102 (App. Div. 2011) (explaining that to be evidential in evaluating a negligence claim, "the statutory violation . . . must be causally related to the happening of the accident, since a permissible inference of causality is indispensable to its relevancy.").

It is extremely attenuated to speculate that the presence of a licensed, rather than a yet-to-be licensed, manager on the premises would have prevented this stabbing, which occurred in the privacy of Campagna's room. It is equally speculative to presume that competent record-keeping would have saved the decedent's life, absent a proven legal duty for management to conduct background checks. Although questions of proximate causation are typically for the trier of fact, this is an instance in which "no reasonable jury could find that plaintiff[s]' injuries were proximately caused by [these cited defective] conditions[.]" Vega by Muniz v. Piedilato, 154 N.J. 496, 509 (1999); see also

Broach-Butts, 456 N.J. Super. at 39 (similarly acknowledging that, at times, the absence of proximate cause can be determined by the court).

In sum, there is simply no codified duty of a rooming house owner to conduct background checks specified in either the RBHA or the DCA regulations. Of course, the Legislature and the DCA have the authority to mandate such checks, but they have not done so.

B.

(Whether a Duty Exists Under New Jersey Common Law)

We next consider whether, as a matter of first impression, our state's common law should impose upon rooming house owners and operators a duty to perform criminal background checks of prospective residents. The trial court correctly ruled that no such duty exists. Nor do we establish such a novel duty.

1.

(The Duty Factors)

"There is no bright line rule that determines when one owes a legal duty to prevent a risk of harm to another." Badalamenti, 422 N.J. Super. at 94. "The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness." Hopkins

v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993).  Accord Robinson v. Vivirito, 217 N.J. 199, 208 (2014).

The analysis of duty "is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct."  Hopkins, 132 N.J. at 439.  "In the end, a court must assess the totality of the circumstances that a reasonable person would consider relevant in recognizing a duty of care to another."  Robinson, 217 N.J. at 209.

Our Supreme Court has identified the following related factors to be weighed and balanced as part of this "complex" duty analysis:

> [1] the nature of the underlying risk of harm, that is, its foreseeability and severity, [2] the opportunity and ability to exercise care to prevent the harm, [3] the comparative interests of, and the relationships between or among, the parties, and, [4] ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution.
>
> [J.S. v. R.T.H., 155 N.J. 330, 337 (1998) (citing Hopkins, 132 N.J. at 439).]

The first factor, the foreseeability and severity of the underlying risk of harm, is "'crucial' in determining whether a duty should be imposed."  Ibid. (quoting Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994)).

Foreseeability is "based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis." J.S., 155 N.J. at 338. "That knowledge may be an actual awareness of risk" or "constructive," in that "the defendant may be charged with knowledge if she is 'in a position' to 'discover the risk of harm.'" Ibid. (quoting Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 578 (1996)).

As to risk of harm posed by third persons, "a plaintiff may be required to prove that defendant was in a position to 'know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[]' that was 'likely to endanger the safety' of another." J.S., 155 N.J. at 338 (quoting Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 507 (1997)). However, if the criminal propensity of a guest on one's premises is not reasonably apparent, we have held that no liability should be imposed on the host for that third party's violent act. See, e.g., Peguero v. Tau Kappa Epsilon, 439 N.J. Super. 77 (App. Div. 2015) (holding that a fraternity was not liable for a party guest's unforeseeable shooting of another guest at the gathering).

The second duty factor requires assessment of the defendant's opportunity or ability to exercise care, or control, to prevent the harm. "[I]mplicated in this analysis is an assessment of the defendant's 'responsibility for conditions

creating the risk of harm' and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm." J.S., 155 N.J. at 339-40 (quoting Kuzmicz v. Ivy Hill Apts., Inc., 147 N.J. 510, 515 (1997)). For example, in the landlord-tenant context, courts have held that "[o]wnership or control of the premises . . . enables a party to prevent the harm." Kuzmicz, 147 N.J. at 517. See also Butler v. Acme Mkts., Inc., 89 N.J. 270, 284 (1982) (holding that a "business invitor is in the best position to provide either warnings or adequate protection for its patrons when the risk of injury is prevalent under certain conditions.").

The third factor focuses on the relationship between the parties and their comparative interests. This involves consideration of "the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." J.S., 155 N.J. at 338. The inquiry is "whether in light of the actual relationship between the parties under all of the surrounding circumstances the imposition . . . of a general duty to exercise reasonable care in preventing foreseeable harm . . . is fair and just." Hopkins, 132 N.J. at 438.

In this regard, Section 40 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm recognizes that because of the "special relationship" between landlords and tenants, landlords generally owe tenants "a

duty of reasonable care with regard to risks that arise within the scope of the relationship."  Restatement (Third) of Torts:  Liability for Physical and Emotional Harm § 40(a), (b)(6) (Am. Law Inst. 2012).

The fourth factor involves consideration of public policy and fairness.  "In fixing the limits of liability as a matter of public policy, courts must draw on 'notions of fairness, common sense, and morality.'"  J.S., 155 N.J. at 339. Additionally, "[p]ublic policy must be determined in the context of contemporary circumstances and considerations."  Ibid.  "Because public policy and social values evolve over time, so does the common law."  Hopkins, 132 N.J. at 435.

As part of this complex common-law analysis of duty, courts must also consider a duty's scope or boundaries.  J.S., 155 N.J. at 339 (quoting Hopkins, 132 N.J. at 443).  "The scope of a duty is determined under 'the totality of the circumstances,' and must be 'reasonable' under those circumstances."  Ibid. (quoting Clohesy, 149 N.J. at 514, 520).  "Factors to be taken into consideration include the risk of harm involved and the practicality of preventing it."  Ibid.

We weave these factors into our discussion of existing New Jersey case law, public policy ramifications, and the laws of other jurisdictions.

## 2.

## (Existing New Jersey Case Law)

To date, no published opinion in our state has held that rooming house owners have a duty to conduct criminal background checks of prospective residents. To be sure, it is well-established that "[a] lodging house or rooming house keeper," while "not an insurer of the safety of his guests," is "required to exercise ordinary care to render the premises reasonably safe for their use." Johnson v. Kolibas, 75 N.J. Super. 56, 64 (App. Div. 1962). That duty requires owners to "maintain[] their premises in a reasonably safe condition." Id. at 65. It also requires owners to warn residents if they become "aware that the premises were no longer safe," for instance, due to "the presence of a fire." Id. at 65-66.

The relationships between rooming house owners and residents are comparable, if not identical, to the landlord-tenant relationships more frequently discussed in our case law. For that reason, cases involving negligence claims by tenants against landlords are to some extent instructive when conducting the duty analysis here.

In Scully v. Fitzgerald, 179 N.J. 114, 118 (2004), the Supreme Court declared that a residential landlord has several specific duties: (1) "to keep areas within his control in a reasonably safe condition so as not to endanger the lives

or property of his tenants"; (2) "to take reasonable security measures for tenant protection on the premises"; and (3) "to take reasonable steps to curtail the dangerous activities of tenants of which he should be aware and that pose a hazard to the life and property of other tenants." Id. at 114, 122. These duties arise, however, only "when the harm is foreseeable and the landlord has sufficient control to prevent it." Id. at 123.

Plaintiffs contend that imposing a duty upon rooming houses to conduct a criminal background check of potential residents falls within already established common-law duties requiring landlords to take reasonable security measures and steps to curtail a tenant's dangerous activities that pose a hazard to the life and property of other tenants. In support of their contention, they rely on Trentacost v. Brussel, 82 N.J. 214 (1980), and Williams v. Gorman, 214 N.J. Super. 517 (App. Div. 1986). Both of those cases are highly distinguishable from the present context.

In Trentacost, the issue before the Court was "whether a landlord who provides inadequate security for common areas of rental premises may be liable for failing to prevent a criminal assault upon a tenant." 82 N.J. at 217. The plaintiff tenant in Trentacost was assaulted and robbed in the common area of an apartment building. Id. at 218. Both the plaintiff and the unknown

A-2989-18T1

perpetrator had entered the building through the front door, which did not have a lock on it. Ibid. The plaintiff's injuries, which included several broken bones, were serious and required a fifteen-day hospitalization. Ibid. The record established that frequent "burglaries and street muggings" occurred in the neighborhood where the building was located. Id. at 218-19. Additionally, two months before she was attacked, the plaintiff "herself reported to [the] defendant an attempt to break into the building's cellar" and "[a]t other times she had notified the landlord of the presence of unauthorized persons in the hallways." Id. at 219.

The Court reasoned in Trentacost that although the landlord "was confronted with the existence of a high level of crime in the neighborhood," he "failed to install a lock on the front door leading in to the building's lobby" thereby "effectively and unreasonably enhanc[ing] th[e] risk" of harm to his tenants. Id. at 222. The Court held, under traditional negligence principles, "that criminal activity affecting the [apartment] building was reasonably foreseeable." Ibid.[9] In so holding, the Court recognized that "[i]f the reasonably prudent person would foresee danger resulting from another's voluntary,

---

[9] The Court also held that the landlord breached the implied warranty of habitability "by failing to secure in any way the front entrance of the building." Id. at 228.

criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability." Ibid.

Plaintiffs' reliance on Trentacost is misplaced. Although this case also involves a criminal act committed by a third party, and the parties in this case have a similar relationship to that of a landlord and tenant, this case is not about inadequate locks or security. The criminal conduct at issue did not take place in a common area of the rooming house. Instead, it took place in Campagna's bedroom. The room had the required lock on the door, and the DCA evaluator who inspected the premises found no signs of forced entry after the murder.

Aside from this distinguishing fact that the harm occurred in a private, secure space, defendants in this case were never put on notice of any safety concerns or complaints about Strong. In addition, the parole authorities, who have expertise in predicting and deterring recidivism by convicted violent offenders, saw fit to release Strong into society, conditioned on reporting obligations. It is unreasonable to expect rooming house operators to have a more astute capability than the parole officials to foresee future criminal behavior on their premises.

Furthermore, unlike the landlord in Trentacost who had control over the common area of the apartment building and the opportunity to prevent

foreseeable harm to his tenants by securing the front door with a lock, defendants here did not have the same level of control over who Campagna chose to invite into his bedroom. See N.J.S.A. 55:13B-19(i) (granting a resident "unrestricted communication, including personal visitation with any person of his choice, at any reasonable hour"). Though defendants were responsible for allowing Strong to become a resident, they did not regulate who Campagna allowed into his bedroom.

Williams is also factually distinguishable from the present matter. There, the plaintiff tenant had voiced repeated complaints to her landlord about the tenant who resided directly above her apartment. She contended the landlord negligently ignored his duty to evict the upstairs tenant based upon her complaints. Williams, 214 N.J. Super. at 519.

Specifically, a commotion in the upstairs tenant's apartment in Williams had caused a chandelier in the plaintiff's apartment to fall from the ceiling and shatter a glass table. Id. at 520. The plaintiff reported the incident to building management, who promised that the upstairs tenant would be evicted. Ibid. A year later, a gunshot blast from the upstairs tenant's apartment blew a hole in the plaintiff's ceiling. Ibid. Although she was not directly hit by the gunfire, the force of the blast caused injuries to her eye and nose. Ibid. The plaintiff reported

this incident to building management and police arrested the upstairs tenant. Ibid.

We recognized in Williams that the principles of Trentacost applied, even though the perpetrator was a tenant in the building, as opposed to an outside intruder. Id. at 523. Even so, we held that the defendants were under no duty to evict the upstairs tenant following the falling chandelier incident, because "the landlord was not on notice as to the [upstairs tenant's] assaultive and destructive tendencies" and "could not reasonably foresee any harm to [the] plaintiff or other tenants in the building." Ibid. We also held that the second incident involving the gunshot was not foreseeable either, despite the plaintiff's complaints about the chandelier incident, in that "[t]he two episodes were entirely of two different breeds"—the first was not a criminal offense while the second was. Id. at 523-24.

Plaintiffs' reliance on Williams is thus unavailing. The main similarity between that case and the present matter, apart from the relationship between the parties, is that the conduct complained of by the plaintiff in Williams was carried out by another resident. Although it is true under Williams that a landlord sometimes may be held liable "when the criminal conduct of one tenant . . . causes harm to another tenant," it is also true that "the injured tenant must

establish foreseeability under a negligence theory" to prevail. Id. at 524.

Here, there is no evidence to suggest that McMaster or Dalton had been put on notice by Campagna or anyone else concerning Strong having committed any criminal or non-criminal "dangerous activities" that posed "a hazard to the life and property of other tenants" before the murder. Scully, 179 N.J. at 114, 122. As noted, this duty arises only "when the harm is foreseeable and the landlord has sufficient control to prevent it." Id. at 123.

Plaintiffs' advocacy of a common-law duty in the present context is also not supported by our recent opinion in Broach-Butts, 456 N.J. Super. at 25. In that case, we held that a private social services agency owed a duty to therapeutic foster home operators to exercise reasonable care in placing children. Id. at 35. We also ruled that the scope of that duty included disclosure about a foster child's background to the foster parents "to enable them to make an informed decision" about whether to accept the child into their homes. Id. at 30.[10]

The facts in Broach-Butts are tragic, as are the facts in this case. The defendant private social services agency placed a fourteen-year-old boy in the plaintiffs' therapeutic foster home. Id. at 31. The child remained there for less

_____

[10] After this appeal was fully briefed, we asked the parties for supplemental briefs addressing the potential significance of Broach-Butts to the issues raised here. We have considered those helpful submissions.

A-2989-18T1

than one year before the plaintiffs requested his removal due to continued behavioral problems. Ibid. After he was removed, the child attempted to burglarize the plaintiffs' home several times. Ibid. During his third burglary attempt, he encountered the former foster father, grabbed a kitchen knife, and killed him by stabbing him twenty-five times. Ibid.

The record revealed that the "defendant was aware of a specific history of multiple violent acts and threats of violence" by the child which it "withheld" from the plaintiffs, including his prior assaults of other foster parents, threats to kill them and other foster children, and an arson at a previous foster parent's property. Id. at 31-32, 36. The plaintiffs' expert opined that the child should not have been placed in a foster home because he posed a danger to others. Id. at 32. The defendants conceded they owed a duty to the plaintiffs while the child was placed in their home but contended that the placement was not a proximate cause of the former foster father's death. Id. at 35.

Many factual differences between Broach-Butts and the present matter weigh against its applicability in this context. Strong's application for residency at the rooming house is distinguishable from the placement of a child in a therapeutic foster home. As we have already shown, neither the RBHA nor the regulations require rooming house owners to evaluate prospective residents for

41

compatibility, as plaintiffs suggest, and rooming houses are not tasked with providing therapeutic services to their residents. Consequently, rooming house owners are not ordinarily privy to a prospective resident's medical or psychiatric history. Moreover, that personal history may be subject to protections under privacy laws. See, e.g., Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-1 to -9.

Although they share common spaces, rooming house residents live autonomously in separate rooms that are secured with locks for their safety. This physical living arrangement is different from a single-family therapeutic foster home, as in Broach-Butts, where a foster child would likely have access to the entire home, including the bedrooms of other family members.

In addition, while the social services agency in Broach-Butts was well-aware of the child's violent background and withheld it from the plaintiffs, there is no evidence in this record to suggest that the LLC or Dalton withheld any information they knew about Strong from its residents, including Campagna.

It is also doubtful whether notice of Strong's 2009 armed robbery conviction would have made Campagna's 2016 murder foreseeable under these facts. Strong was recommended to defendants by another resident. No one in the rooming house had lodged any complaints to defendants about Strong's

behavior.  No violent crimes had ever occurred at the rooming house.  A lock on each resident's door provided protection from intrusion.

We are aware the record contains some deposition testimony that Strong had been seen by one or more residents holding and throwing down a knife, but there is no proof those observations had been reported to defendants.  Nor is there proof that Strong had threatened anyone on the premises with a knife.  Further, although a few residents had observed moments of acrimony between Strong and decedent, there was other conflicting testimony that showed the two men had spent time amicably with one another.  And, as we have already noted, the stabbing occurred behind closed doors in Campagna's room, after he apparently invited Strong to join him there.

The nature of the relationship between defendants and plaintiffs in this case fundamentally differs from the relationship between the social services agency and the foster family in Broach-Butts.  These differences weigh against declaration of a duty to conduct criminal background checks of prospective residents.

In sum, the case law relied upon by plaintiffs falls short in supporting the novel common-law duty to conduct background checks they seek to establish.

3.

(Public Policy Ramifications)

Even assuming that defendants had performed a criminal background check of Strong and learned of his robbery conviction, there are significant public policy ramifications about what a rooming house would be expected to do with that information, if a legal duty to conduct a criminal background check of prospective residents were imposed.

"In deciding whether to recognize the existence of a duty of care . . . [courts] must bear in mind the broader implications that will flow from the imposition of a duty." Estate of Desir v. Vertus, 214 N.J. 303, 326 (2013). "[I]t is essential to recognize not the interests of the particular individuals before the Court, but instead to take careful consideration of the effect that the creation of a duty will have more generally on the public." Id. at 328. "Part of an evaluation of the public interest must be the consideration of how establishing this duty will work in practice." Ibid.

The practical effects of creating a duty for rooming house owners to conduct criminal background checks of prospective residents might be either: (1) a need to disclose a new resident's criminal history to the other residents for their protection; or (2) a need to reject a prospective resident's application based

upon the apparent criminal history. Both of these possible outcomes have debatable ramifications.

The first outcome raises policy concerns because sharing a new resident's criminal background with other residents would potentially violate his or her statutory right to privacy and potentially foster unnecessary fear and conflict. See N.J.S.A. 55:13B-19(g) (granting rooming house residents the right to privacy).

As for the second likely consequence—outright rejection of an applicant based upon any criminal conviction—that outcome would surely inhibit the ability of persons with criminal histories to obtain affordable housing. "Lack of affordable housing represents a significant barrier to housing access among former prisoners, who often have low incomes and limited employment prospects after prison." Danya E. Keene et al., Navigating Limited and Uncertain Access to Subsidized Housing After Prison, 28 Hous. Policy Debate 199, 200 (2018). The alternative for a prospective resident with a criminal history could be homelessness or reincarceration.[11]

---

[11] See, e.g., Bruce Western et al., Stress and Hardship after Prison, 120 Am. J. of Sociology 1512, 1537 (2015) ("In a sample of Massachusetts prisoners going to neighborhoods in Boston, over a third stayed in marginal or temporary housing" which included rooming houses "and half were unemployed after six

Notably, although certain federal and state housing guidelines do <u>allow</u> property owners to conduct criminal background checks of prospective residents so long as they are not used in a discriminatory manner, such checks are not <u>mandated</u>. <u>See</u> <u>Pasquince v. Brighton Arms Apts.</u>, 378 N.J. Super. 588, 596-603 (App. Div. 2005) (recognizing that under federal and state laws pertaining to the Section 8 housing program, landlords have the right to conduct background checks on prospective Section 8 tenants); <u>Mitchell v. Ridgewood E. Apts., LLC</u>, 205 So. 3d 1069, 1076 (Miss. 2016) (holding that HUD regulations "are merely permissive" in that they authorize, but do not require, landlords "to deny admission" to drug-involved or violent criminal offenders); <u>Karim-Panahi v. 4000 Mass. Apts.</u>, 302 F. Supp. 3d 330, 337 (D.D.C. 2018) (explaining that landlords who participate in the Section 8 program "may screen prospective tenants and reject them if screening reveals red flags in terms of . . . criminal activity").[12]

---

months."); Teresa Wiltz, <u>Where 'Returning Citizens' Find Housing After Prison</u>, Stateline, an initiative of The Pew Charitable Trusts, April 23, 2019, http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2019/04/23/where-returning-citizens-find-housing-after-prison.

[12]  It is not clear from the record whether the rent subsidy Strong sought and Dalton anticipated receiving was through the Section 8 program, or some other program.

Additionally, outright rejection of a prospective rooming house resident based upon criminal history arguably might constitute unlawful discrimination, depending on the facts.[13] And sometimes automated background checks generate incorrect information, causing certain applicants to be unfairly denied

---

[13] In 2016, the Office of General Counsel, U.S. Department of Housing and Urban Development, issued Guidelines entitled "Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" that are instructive in this context. The Guidelines recognize that "[w]hen individuals are released from prisons and jails, their ability to access safe, secure and affordable housing is critical to their successful reentry to society." Further, "many formerly incarcerated individuals . . . encounter significant barriers to securing housing, including public and other federally-subsidized housing, because of their criminal history." The Guidelines caution that "criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers" and that "criminal history-based restrictions on housing opportunities violate the [Fair Housing] Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another."

Thus, in the context of deciding whether to exclude prospective residents based on a criminal conviction, the Guidelines recommend that landlords "take into account the nature and severity of an individual's conviction" and "consider the amount of time that has passed since the criminal conduct occurred" in order to avoid violating federal law. The Guidelines clarify that if a prospective tenant has been convicted of the illegal manufacturing or distribution of a controlled dangerous substance, a housing provider will not be liable for discrimination under the Fair Housing Act if the provider rejects the prospective tenant due to that sort of drug conviction.

A-2989-18T1

housing.[14]  We need not resolve these concerns here, except to note that the issue underscores the sensitive policy ramifications that would flow from the recognition of the proposed duty to conduct background checks.

4.

(Other Jurisdictions)

Lastly, unlike our analysis in Broach-Butts that was supported by cases with similar facts from other jurisdictions, our research has not uncovered any opinions from other states holding that rooming house owners or landlords had a legal duty to conduct criminal background checks of prospective residents.  On the contrary, the highest courts of two states have declined to impose such a duty.

In Mitchell, the Mississippi Supreme Court held that a landlord "had no duty—either at law or assumed based on its policies—to conduct a criminal history background check on its tenants . . . ." 205 So.3d at 1078.  There, a sixteen-year-old who was visiting relatives at an apartment complex was shot

---

[14] Lauren Kirchner & Matthew Goldstein, How Automated Background Checks Freeze Out Renters (May 28, 2020), http://www.nytimes.com/2020/05/28/business/renters-background-checks.html (reporting that a study of hundreds of federal cases in the past decade reveals that tenancy screeners allegedly have repeatedly misidentified applicants as having criminal records and poor credit histories).

and killed by a tenant's boyfriend who lived at the complex but was not listed on the tenant's lease. Id. at 1071-73. In finding no duty, the Court noted that, despite the boyfriend's presence on the premises for two years, the landlord had never received any complaints about him. Id. at 1079.

In Castaneda v. Olsher, 162 P.3d 610, 618 (Cal. 2007), the California Supreme Court similarly declined to impose a duty upon landlords to conduct criminal background checks of all prospective tenants because it "would involve significant expense and delay for the landlord and unfairly deprive many Californians of housing." The Court also reasoned that criminal background checks were not likely to be an effective means of protecting residents from frequent gang-related gun violence in a mobile home park since: (1) juvenile records are confidential; and (2) "even adult criminal records do not necessarily reflect the circumstances of a crime from which a landlord could reliably decide whether renting to the applicant poses a threat of gang violence." Ibid.[15]

---

[15] A recent Harvard Law Review article identified a trend in cities around the country to either bar or restrict a landlord's use of a rental applicant's criminal history when deciding whether to rent property to the applicant. Housing Law--Criminal Screening of Tenants—Seattle Bans the Use of Criminal History in Rental Decisions--Seattle, Wash., Ordinance 125393 (Aug. 23, 2017), 131 Harv. L. Rev. 1844 (2018). The article describes "the efforts of several jurisdictions to prevent or reduce housing discrimination against ex-offenders." These efforts range from "a complete ban on considering criminal history in Urbana, Illinois,

5.

(Conclusion)

To conclude, the pertinent factors do not support a newly fashioned legal duty that would require rooming house owners to conduct criminal background checks of prospective residents. The duty is not specified in or implied by our State's rooming house statutes or regulations, not supported by existing case law, and not recognized in any other state. The duty, if created and enforced, would also produce significant public policy ramifications that are best evaluated elsewhere.

As illuminated by our discussion, the factors of foreseeability, risk avoidance, relationships, and public policy and fairness, on the whole, weigh against adopting the proposed duty.

To be sure, performing background checks of rooming house applicants

---

enacted in 1979, to the more recent and limited laws in Newark, New Jersey; Washington, D.C.; Champaign, Illinois; Richmond, California; and San Francisco, California, which restrict what criminal history a landlord can consider and require the landlord to perform an individualized assessment." Id. at 1844-45. (emphasis added); See Newark, N.J., Rev. Gen. Ordinances, tit. 2 §§ 31-1 to -9 (2016) (limiting the scope of and manner in which landlords are permitted to inquire into a prospective tenant's criminal background, and also mandating confidentiality related to an applicant's criminal background check).

might keep some dangerous persons off the premises and protect other residents. Nothing in this opinion prevents owners and operators from conducting such checks if they choose to do so. However, plaintiffs have not demonstrated that such checks should be judicially mandated, given the other ramifications that would ensue. The policy choice about mandating checks is instead for the Legislature and the DCA as the administrative agency entrusted with the regulation of rooming houses.

### III.

Although the facts of this case are surely tragic, the existing law does not provide a basis for the litigation to proceed. Put simply, if there is no duty, there is no case. Summary judgment was properly granted as a matter of law. R. 4:46-2(c).

Because we agree with the trial court and defendants that no mandatory duty to perform criminal background checks of residents exists, plaintiffs' additional contentions pertaining to their negligence claims are moot. In addition, we see no need to remand this matter as plaintiffs suggest as an alternative disposition.

All other arguments presented on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

A-2989-18T1

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2989-18T1