**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0755-16T2

WANDA BROACH-BUTTS,
Administratrix of the Estate
of THEOTIS BUTTS, deceased,
and WANDA BROACH-BUTTS, in
her own right,

     Plaintiffs-Appellants,

and

KHALIA BUTTS, CANDICE
BUTTS, and FORES BUTTS,

     Plaintiffs,

v.

THERAPEUTIC ALTERNATIVES, INC.,
d/b/a COMMUNITY TREATMENT
SOLUTIONS, DREW BARRETT,
JENNIFER LAWSON, and JENN HESS,

     Defendants-Respondents,

and

DIVISION OF CHILD PROTECTION
AND PERMANENCY, DEPARTMENT OF
CHILDREN AND FAMILIES, STATE
OF NEW JERSEY, FAMILY SERVICES
ASSOCIATION, SEQUEL CAMELOT
HOLDINGS, LLC, and SEQUEL OF NEW
JERSEY, INC., d/b/a CAPITAL
ACADEMY,

     Defendants,

and

> **APPROVED FOR PUBLICATION**
>
> **August 13, 2018**
>
> **APPELLATE DIVISION**

PERFORMCARE,

>     Defendant/Third-Party
>     Plaintiff,

and

D.M.,

>     Third-Party Defendant-
>     Respondent.

_____

Submitted October 30, 2017 — Decided August 13, 2018

Before Judges Sabatino, Ostrer and Whipple (Judge Sabatino concurring).

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2746-13.

Anapol Weiss, attorneys for appellants (Lawrence R. Cohen and David J. Carney, on the briefs).

Naulty, Scaricamazza & McDevitt, LLC, attorneys for respondent Therapeutic Alternatives, Inc., Drew Barrett, Jennifer Lawson and Jenn Hess (Michael J. Follett, on the brief).

Daniel E. Somers, attorney for respondent D.M.

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiffs Wanda Broach-Butts and the estate of her late husband, Theotis (Ted) Butts, allege that defendant Therapeutic Alternatives, Inc., a private social service agency, negligently placed a troubled and dangerous child, D.M., then over fourteen

years old, in the therapeutic foster home Wanda and Ted operated, and failed to adequately warn them of D.M.'s history of dangerous behavior.[1] Plaintiffs claim that defendant's negligent placement and failure to warn created an ultimately deadly relationship between them and D.M. Fifteen months after D.M. left plaintiffs' home, he returned and killed Ted.

We conclude that defendant owed a duty to plaintiffs to exercise reasonable care in placing D.M. in plaintiffs' home, and to reasonably disclose D.M.'s background to enable them to make an informed decision whether to accept him. Whether defendant breached that duty, and whether that breach proximately caused the harm that followed, are questions for the jury. We therefore reverse the trial court's order granting summary judgment, dismissing plaintiffs' complaint against Therapeutic Alternatives.[2]

---

[1] We intend no disrespect in utilizing first names for convenience. We will also refer to Wanda and Ted jointly as "plaintiffs" when addressing matters that preceded Ted's death. Although the summary judgment order also dismissed the claims of Wanda's and Ted's children, they are not parties to the appeal.

[2] The order also dismissed claims against three individuals allegedly involved in handling D.M.'s case. Although plaintiffs appealed from the entire order, they addressed in their brief only their claims against Therapeutic Alternatives. We therefore deem any appeal regarding the three alleged workers to be abandoned. See Grubb v. Borough of Hightstown, 353 N.J. Super. 333, 342 n.1 (App. Div. 2002). Furthermore, plaintiffs did not directly sue D.M. He was only named as a third-party
(continued)

I.

We view the facts in a light most favorable to plaintiffs. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995). D.M. resided in plaintiffs' home between July 2009 and April 2010. He was removed from the home at plaintiffs' request. The removal was prompted by instances of eloping, possessing "R" rated movies, bringing four girls into the home without permission, and possessing a prescription medication that was not prescribed for him, apparently to resell. He returned to institutional settings unaffiliated with defendant, and continued to engage in aggressive and erratic behaviors, including acts of delinquency that resulted in contacts with the juvenile justice system.

During the months after his removal, D.M. repeatedly returned to burglarize plaintiffs' home. He returned for a third time fifteen months after his removal. By that time, there were active warrants for his arrest. D.M. intended to flee to Florida, using the fruits of his burglary. But, on this third occasion, he happened upon Ted, who told him to leave the

_____

(continued)
defendant by another defendant-entity, Performcare, which was dismissed with prejudice, along with the Division of Child Protection and Permanency (Division), and other entities. Plaintiffs did not appeal those prior dismissal orders. We refer to Therapeutic Alternatives, Inc. as "defendant."

A-0755-16T2

home. D.M. grabbed a kitchen knife and stabbed Ted twenty-five times and killed him.

Although plaintiffs were aware that D.M. was a troubled youth — all children placed in their therapeutic home were — defendant withheld significant information about D.M. Defendant did not disclose D.M.'s psychological assessments; the incidents of abuse and neglect by his own parents; the murder of his mother; multiple ill-fated placements; an incident of arson involving a previous foster parent's property; assaults of other foster parents; threats of self-harm; and several instances of terroristic threats, such as to kill with weapons, which he made against multiple targets, including foster parents, a foster child, and a teacher.

In particular, D.M. twisted the arm of one foster mother. He threatened a psychological worker with a baseball bat. He threatened to blow up a school and kill a teacher. He threatened to break a glass over another foster mother who stood in D.M.'s way, as he tried to reach a knife. The same foster mother reported that D.M. attempted to kill himself and another foster child with a knife, and threatened to burn down the home and kill everyone inside. Plaintiffs were also not made aware that immediately before D.M.'s placement in their home, a clinician for another Division contractor recommended that D.M.

laterally move to another residential treatment center from the one that discharged him for impulsive and unsafe behaviors.

Plaintiffs allege that had defendant adequately disclosed D.M.'s background, they would have rejected his placement, preventing the subsequent homicide. They supplied expert opinions that the placement of D.M. in a foster home, even a therapeutic one, and the failure to inform plaintiffs of D.M.'s dangerous background, violated governing standards of care. One expert opined that the records reflected that D.M. should not have been placed in a foster home and the "community needed to be protected from him. His aggressive, assaultive behaviors started early and did not change. The professional evaluations were numerous and consistently predicted the danger that he posed to others."

Defendant contends that it was obliged to comply with the State's "no eject, no reject" policy, which required it to accept all referrals.[3] Defendant also contends that plaintiffs

---

[3] See N.J.A.C. 10:73-3.11. A policy and procedure manual of defendant states that while it "maintains a 'no reject, no eject' policy," some clients may be discharged from the shelter program for "behaviors [that] are not sustainable in the treatment home" such as breaking the law or conditions of release, physical violence to treatment home residents, and "runaway behavior or other actions [that] compromise the well-being of other clients." Even if defendant owed a duty to accept all referrals from the Division, defendant does not rely on a contractual provision or regulation that similarly bound
(continued)

knew D.M. was troubled; he was incarcerated when Wanda first talked to him. Wanda had advanced degrees in nursing, and experience working in the mental health field. She and her husband reported that D.M. was never violent or disrespectful during his placement. Defendant also had no knowledge of D.M.'s increasingly erratic behavior and criminal arrests after he left plaintiffs' home.

After discovery, the trial court granted defendant's motion for summary judgment. In a brief oral opinion, the trial court held that defendant lacked a duty to warn plaintiffs about the dangerous behavior and acts of delinquency that D.M. committed in the months following his removal from their home.

## II.

Exercising de novo review, see Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010), we conclude the trial court erred.

As a threshold matter, the trial court misperceived the nature of plaintiffs' claims. Plaintiffs do not contend that

_____

(continued)
plaintiffs. We note, however, that the contract between defendant and plaintiffs, as "Provider," states, "Provider understands that a Client [a foster child] is assigned to the Home and that Provider does not 'choose' a Client." Once a child was placed, plaintiffs were required to give thirty days' notice if they were no longer able to care for the child, and to confer with defendant "[i]f the Provider feels unable to provide care to a Client . . . ."

defendant had a continuing duty to warn plaintiffs about D.M. after he left their home. Rather, they contend defendant had a duty, before D.M.'s initial placement, to exercise reasonable care in determining whether he was suited for plaintiffs' home, and to reasonably inform plaintiffs about D.M.'s history. The crux of the case is whether defendant had such a duty; whether defendant breached that duty; and whether that breach proximately caused Ted's death and other alleged damages. See Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013) (stating a negligence action requires proof of "(1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages").[4]

### A.

We first consider the issue of duty. The existence and scope of a duty are legal questions. Pequero v. Tau Kappa Epsilon Local Chapter, 439 N.J. Super. 77, 88 (App. Div. 2015). Whether a duty exists "involves identifying, weighing, and balancing several factors — the relationship of the parties, the nature of the attendant risk, the opportunity and ability to

_____

[4] Plaintiffs' expert further opined that defendant failed to provide adequate services and information during D.M.'s stay in the foster home. However, plaintiffs do not argue before us that their damages were caused by a breach of duty to provide essential services while D.M. was placed in the home, or to remove D.M. sooner than it did. We therefore do not address such potential duties.

exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). "The '[a]bility to foresee injury to a potential plaintiff' is 'crucial' in determining whether a duty should be imposed." J.S. v. R.T.H., 155 N.J. 330, 338 (1998) (quoting Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194 (1994)). "Whether a duty exists is ultimately a question of fairness." Goldberg v. Housing Auth. of Newark, 38 N.J. 578, 583 (1962).

Although we are unaware of any New Jersey case directly on point, our Court has held that a person may owe a duty of care to the victim of another person's intentional wrongs. In J.S., 155 N.J. at 352, the Court held that "when a spouse has actual knowledge or special reason to know of the likelihood of his or her spouse engaging in sexually abusive behavior against a particular person or persons, a spouse has a duty of care to take reasonable steps to prevent or warn of the harm." The Court has also recognized that landowners may owe a duty to protect their invitees from a third-party's wrongful or criminal acts. In Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 519-20 (1997), the Court held that a supermarket owed a duty, under the circumstances, to provide its customer with "some measure of security" in the parking lot, where it was

reasonably foreseeable the customer could suffer injury as a result of a third party's criminal acts. In that case, a woman was kidnapped from the supermarket parking lot and killed. See also Butler v. Acme Markets, Inc., 89 N.J. 270 (1982).

We have no difficulty holding that a social service agency like Therapeutic Alternatives, which places troubled youths into foster homes, owes foster parents a duty to exercise reasonable care in placing a child, and to reasonably disclose a child's background to enable them to make an informed decision whether to accept the child. The common law must adapt to establish duties that "meet an ever-changing society's needs." G.A.-H. v. K.G.G., ___ N.J. Super. ___, ___ (App. Div. 2018) (slip op. at 7) (considering whether a duty is owed by a defendant who knew or had reason to suspect a co-worker sexually abused a minor). Indeed, defendant "acknowledges it had a duty to the Butts[es]" — without defining its scope — "during the nine months D.M. was placed in the home." Having conceded it had a duty, defendant instead contends the placement was not a proximate cause of Ted's death (an issue we address below), and defendant had no duty after D.M. left the home.

The duty to exercise reasonable care in placement and to adequately warn, arises from the totality of the circumstances. See Clohesy, 149 N.J. at 514 (stating that our courts "have

consistently applied the totality of the circumstances rule when determining the existence and scope of duty"). The placement agency has a direct relationship with the foster parents.[5] The parents likely rely upon the agency's judgment to assure the placement is reasonably appropriate in light of the child's needs and challenges, and the parents' resources and capabilities. The parents also rely upon the agency to adequately disclose the background and needs of the prospective foster child, both so they can decide whether they want to proceed, and so they can best address the child's needs once placed.

Furthermore, the agency has a direct relationship with the child it places, and is privy to details about the child that the foster parents are not. See G.A.-H., ___ N.J. Super. at ___ (slip op. at 9-10) (considering "the scope of the relationship between the abuser and the targeted defendant" and stating that "the parties' relationships and the extent to which the defendant had access to or otherwise possessed knowledge of the

---

[5] Notably, plaintiffs do not assert that the duty arises out of the contract — although their contract with defendant required defendant to "communicate to Provider pertinent information regarding Client(s) to be placed in the Home." Nor does defendant point to a contractual provision that purports to absolve them of liability. Therefore, we do not address contractual grounds for liability, or the viability of contract-based defenses. Similarly, neither party contends that a State law or regulation governs the nature of defendant's duty.

abuser's conduct" may justify imposing a duty). While some placements will ultimately prove unsuccessful, even tragically so, we perceive no reason why an agency would be incapable of exercising reasonable care in the process, and making reasonable disclosures.

One need not foresee a homicide to recognize that harmful consequences are a foreseeable outcome of a failure to exercise reasonable care in placement, and a failure to reasonably disclose information about a foster child's violent propensities. Defendant was aware of a specific history of multiple violent acts and threats of violence by D.M.[6] Whether defendant in this case could foresee the specific harm that befell plaintiffs, fifteen months after D.M.'s removal, is relevant to the issue of proximate cause, which we discuss below. See Clohesy, 149 N.J. at 502-03 (distinguishing between "[f]oreseeability as a determinant of a business owner's duty of care to its customers" and "foreseeability as a determinate whether a breach of duty is a proximate cause of an ultimate injury"). However, recognition of the duty depends upon the general foreseeable risk that harm could befall the foster

---

[6] That specific knowledge of past behavior distinguishes this case from Pequero, for example, where we held that a fraternity did not owe a duty to the victim of a shooting at a fraternity party, in significant part because the risk of gunfire was not reasonably foreseeable. 439 N.J. Super. at 93-94.

A-0755-16T2

family or the child if reasonable care were not taken in placing a child, and in adequately informing the foster parents.[7]

We do not imply that an agency's duty is boundless. Yet, as a matter of public policy, the exercise of reasonable care in placement and disclosure has the salutary effect of protecting both foster parents and foster children. We recognize that imposing a duty and potential civil liability on an agency like defendant may deter some agencies from assisting the Division in placing children. On the other hand, absent such a duty, some potential foster parents may be deterred from offering themselves as caregivers to children in need.

B.

Persuasive authority in other jurisdictions supports our conclusion that a duty exists. In Johnson v. State of California, 447 P.2d 352 (Cal. 1968), a foster child assaulted the foster mother, who contended that state officials failed to disclose the child's violent tendencies. "As the party placing the youth with [the foster mother], the state's relationship . . . was such that its duty extended to warning of latent,

_____

[7] We acknowledge the possibility that a troubled foster child might also injure someone, or damage property, outside the foster home. We do not reach the question of a placement agency's duty to such a third-party victim. But see Sonya A. Soehnel, "Governmental tort liability for social service agency's negligence in placement, or supervision after placement of children," 90 A.L.R.3d 1214 (2017).

dangerous qualities suggested by the [child's] history or character." Id. at 355. The court found "the state owed a duty to inform [the foster mother] of any matter that its agents knew or should have known that might endanger the [foster parents' family] . . . ." Ibid. The duty to disclose "certainly would have included 'homicidal tendencies, and a background of violence and cruelty' as well as the youth's criminal record." Ibid.[8]

Like this case, Snyder v. Mouser, 272 N.E.2d 627, 635 (Ind. Ct. App. 1971), involved a foster mother's claim that a social welfare agency negligently failed to warn that their foster child had "homicidal propensities," which led him to kill her husband. In reversing the trial court's dismissal, the appellate court rejected the agency's argument that it "had no duty to disclose to decedent the child's known dangerous propensities, because no statute impose[d] that duty." Id. at 634. The court also rejected a claim that the child's records were privileged. Ibid. The court found it difficult to fathom "how it would be a violation of any confidence or privilege to

_____

[8] The court recognized that its broadly stated duty "may be subject to some qualification — for example, in cases in which sufficiently important policy objectives, achievable only by silence, outweigh the obvious interest in cautioning persons exposed to danger." Id. at 355 n.2. As the state had not offered such a justification for its silence, the court did not address the matter further.

tell . . . prospective foster parents, everything about the foster child which might be reasonably calculated to affect his and their safety and well being while living together in the relationship of parent and child."  Ibid.

Haselhorst v. State, 485 N.W.2d 180 (Neb. 1992), involved an appeal from a bench-trial verdict for damages after a foster child sexually assaulted the foster parents' natural children. The court affirmed the trial court's finding that the state owed a duty to disclose the child's psychological profile.  Id. at 186.  In violation of the placement agreement entered into between the foster agency and the foster parents, the state agency failed to obtain records of the child's hospitalization after he attacked his mother several times, and once threatened to knife her, when she was pregnant, to kill her expected child. Id. at 184.

In Savage v. Utah Youth Village, 104 P.3d 1242, 1250 (Utah 2004), the Utah Supreme Court recognized a cause of action for negligent placement brought by foster parents after a foster child sexually assaulted their three-year-old natural child. Although the foster parents agreed to foster a child who committed a sexual offense, they alleged that defendant, a private placement agency, negligently placed the child in their home after failing to warn them of the foster child's prior

record of "serious sexual deviancy" and "habitual molestation of young children." Id. at 1246. The court held, "Placement agencies such as [defendant] have a special duty to prevent abuse to and by the children they place in foster homes." Id. at 1247. It also was reasonably foreseeable that a child with a "known history of sexually abusing young children might sexually abuse again if placed in a home with young children." Id. at 1246. The "duty to notify the [foster parents] of [the foster child]'s past behavior" was not "too burdensome when weighed against the potential harm of continued sexual abuse." Id. at 1246-47.

In sum, we are persuaded that defendant owed a duty to plaintiffs to exercise reasonable care in placing a foster child in their home. They also had a duty to inform plaintiffs of a prospective placement's prior history, to enable plaintiffs to make an informed decision as to whether they wished to accept the child into their home.

C.

We return to the issue of proximate cause. Defendant contends that the homicide, which occurred fifteen months after D.M. left the home, was simply too remote and unforeseeable. "Ordinarily, issues of proximate cause are considered to be jury questions." Perez v. Wyeth Labs. Inc., 161 N.J. 1, 27 (1999)

(quoting <u>Garrison v. Twp. of Middletown</u>, 154 N.J. 282, 308 (1998) (Stein, J., concurring)); <u>Cruz-Mendez v. Isu/Insurance Servs.</u>, 156 N.J. 556, 576 (1999); <u>J.S.</u>, 155 N.J. at 351; <u>Goldberg</u>, 38 N.J. at 604. However, a court may decide the issue as a matter of law where "no reasonable jury could find that the plaintiff's injuries were proximately caused . . . ." <u>Vega by Muniz v. Piedilato</u>, 154 N.J. 496, 509 (1998).

Proximate cause is "a 'cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" <u>Cruz-Mendez</u>, 156 N.J. at 575 (quoting <u>Daniel v. Dep't of Transp.</u>, 239 N.J. Super. 563, 595 (App. Div.), <u>aff'd o.b.</u>, 79 N.J. 547 (1979)). It is not enough that the injury would not have occurred but for the defendant's negligence, where there are other contributing causes of the injury. A plaintiff must show that the negligence was a "substantial factor" contributing to the result. <u>See</u> <u>Komlodi v. Picciano</u>, 217 N.J. 387, 422 (2014) ("[T]he 'substantial factor' test is given when there are concurrent causes potentially capable of producing the harm or injury."); <u>Verdicchio v. Ricca</u>, 179 N.J. 1, 24-25 (2004). "A substantial factor is one that is 'not a remote, trivial or inconsequential cause.'" <u>Komlodi</u>, 217 N.J. at 423 (quoting <u>Model Jury Charge (Civil)</u> § 6.13,

"Proximate Cause — Where There is Claim that Concurrent Causes of Harm are Present and Claim that Specific Harm was Not Foreseeable" (approved May 1998)).

Foreseeability is a factor in determining proximate cause. However, it is not essential. "If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him [or her] from being liable." Restatement (Second) of Torts § 435(1) (Am. Law Inst. 1965). Proximate cause "fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 246, 264 (1985) (emphasis added).

On the other hand, "[t]he actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." Restatement (Second) of Torts § 435(2); see also J.S., 155 N.J. at 352. In Caputzal v. Lindsay Co., 48 N.J. 69, 78-79 (1966), the Court relied on § 435(2) in holding as a matter of law no liability for a plaintiff's heart

attack prompted by fear of poisoning by discolored water because it was "so highly extraordinary a result . . . ."

Defendant argues that D.M.'s homicide of Ted was so unforeseeable and remote in time that we should hold as a matter of law that any breach of duty regarding placement or disclosure was not a proximate cause. We decline to do so.

A jury can make the following findings essential to plaintiffs' claims: defendant breached its duty of care in placing D.M. and making inadequate disclosure; but for that breach, plaintiffs would not have accepted D.M. into their home; the subsequent homicide would never have occurred; and defendant's breach was a significant factor in the chain of causation. We do not think the attack of Ted was so "highly extraordinary" under the circumstances that we should find proximate cause absent as a matter of law.

D.M. was a child who never had a stable family. A reasonable jury could find it foreseeable that D.M. would form a bond with plaintiffs that would lead him to return time and again during the fifteen months following his removal. Put another way, the remoteness in time of D.M.'s attack was tempered by his two prior burglaries of the home. A jury could reasonably find that the ties that defendant established between D.M. and plaintiffs were never fully severed.

A-0755-16T2

We acknowledge that the injuries in otherwise comparable cases occurred more closely in time with the foster child's placement than occurred here. See Snyder, 272 N.E.2d at 628 (noting that "[w]hile living in the Snyder home the ward shot and killed Mr. Snyder"); Johnson, 447 P.2d at 354 (explaining that the foster child's assault of the foster mother was five days after the foster child was placed in the home). However, "'[p]roximate cause connotes not nearness of time or distance, but closeness of causal connection.'" Cruz-Mendez, 156 N.J. at 577 (quoting Powers v. Standard Oil Co., 98 N.J.L. 730 (Sup. Ct. 1923)).

Nor was it unforeseeable that D.M. would react with violence when Ted confronted him. D.M. had an extensive history of erratic, aggressive and violent behavior. In any event, it is not essential that defendant could foresee the precise manner and circumstances of the injury. See Restatement (Second) of Torts § 435(1).

We do not view D.M.'s own criminal actions as an intervening cause of plaintiffs' damages that relieves defendant of liability. "Intervening causes that are reasonably foreseeable or are normal incidents of a risk . . . do not relieve a tortfeasor of liability." Cruz-Mendez, 156 N.J. at 575. "If the reasonably prudent person would foresee danger

20

resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability." Butler, 89 N.J. at 276. The court in Haselhorst applied these principles to a case similar to the one before us. "[T]he likelihood of the foster child acting out his violent behavior was the hazard that made the department's conduct negligent in failing to obtain the records from [the child's prior hospitalization] and sharing that information with the Haselhorsts, [and] in failing to properly investigate . . . ." Haselhorst, 485 N.W.2d at 188.

In sum, we hold that defendant had a duty to exercise reasonable care in placing D.M., and a duty to reasonably disclose such aspects of D.M.'s background to enable plaintiffs to make an informed decision whether to accept him into their household. A jury shall determine whether defendant breached that duty, and whether that breach proximately caused Ted's death and the consequent damages.

Reversed and remanded for trial. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

**SABATINO, P.J.A.D., concurring.**

I join in Judge Ostrer's erudite and well-reasoned analysis of the common law principles that govern this litigation. I write to add a few prospective comments.

Regardless of whether a jury imposes civil liability on this particular defendant, I respectfully urge the State to explore measures that might prevent the fatal tragedy in this case — or some other violent assault by a youth inflicted upon a resource parent — from being repeated.

For example, the State might adopt and enforce stringent regulations obligating private placement agencies to provide sufficient warning of the known dangerous characteristics of troubled youths to resource families, before such youths are taken into their homes. We are unaware that any regulations of that sort exist at the present time.

As a separate measure, the State might insist upon contractual provisions mandating placement agencies to carry out the important responsibility of notification detailed in this opinion. The contracts could specify, for instance, that such agencies face termination, perhaps with financial penalties, if they fail to perform that responsibility. Again, we are unsure from this record if typical State contracts already contain such language.

A-0755-16T2

As it so happened, the State was not a participant in this appeal, as plaintiffs did not seek review of the dismissal of the State defendants from the case. We therefore lack the benefit of the State's briefing and perspective on these weighty issues. Nor have we been fully apprised of how the State's "no eject, no reject" policy bears upon the circumstances, and whether that policy imposes undue pressure on agencies to place troubled children rapidly with families.

In any event, perhaps the spotlight of this tragic case will spur more effective ways to protect host families from harm. Ideally that can be done without diminishing the roster of qualified caregivers who are willing to open their homes to difficult needy children. We also are mindful that greater care in the placement process can reciprocally protect children from deficient foster caretakers.

It is not for us as judges, of course, to devise the appropriate policy solutions. Although the specter of civil liability can play an appropriate role in shaping future conduct, well-crafted regulations and vigilant contractual oversight may well offer more effective safeguards.

We therefore commend these policy issues to the efforts and expertise of the other branches of government, and to possible innovations of the private sector.

In the meantime, this litigation will continue in the trial court, as it must, under the applicable rules of law. But no matter who wins or loses before the jury, let us all hope that the life that was senselessly lost in this case will somehow result in more lives being spared in the future.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0755-16T2