# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0413-18T4

S.H. and L.H.,

     Plaintiffs-Appellants,

v.

K & H TRANSPORT, INC., K & H
TRANSPORT, LLC, ORANGE
BOARD OF EDUCATION,
SUSSEX COUNTY REGIONAL
TRANSPORTATION COOPERATIVE,

     Defendants-Respondents,

and

PALISADES LEARNING CENTER,
INC., a/k/a PALISADES ACADEMY,
PALISADES REGIONAL ACADEMY,
PALISADES REGIONAL SCHOOL
and/or PALISADES REGIONAL,

     Defendants.
_____

CITY OF ORANGE TOWNSHIP
BOARD OF EDUCATION,

     Third-Party Plaintiff,

v.

APPROVED FOR PUBLICATION

November 12, 2020

APPELLATE DIVISION

SUSSEX COUNTY REGIONAL
TRANSPORTATION COOPERATIVE,

       Third-Party Defendant.
_____

Argued September 17, 2019 - Decided November 12, 2020

Before Judges Fisher, Accurso and Gilson.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-2169-16.

Stephanie M. Lockspeiser argued the cause for
appellants (Stark & Stark, P.C., attorneys; Stephanie
M. Lockspeiser, on the briefs).

Neal A. Thakkar argued the cause for respondents
(Sweeney & Sheehan, P.C., attorneys; F. Herbert
Owens, III, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Plaintiff S.H. (Stephanie), a seventeen-year-old special needs student at the time of these events, and her mother L.H. (Mrs. H.),[1] appeal from a

---

[1] These names are fictitious. Were this case filed in the Criminal Division or the Family Part, we would employ initials for Stephanie and her mother, as the trial court has in the caption we adopt, to protect Stephanie's identity as the minor victim of an alleged sexual assault. See R. 1:38-3(c)(12) (shielding names of alleged victims of sexual assault in criminal and municipal court cases); R. 1:38-3(d)(10) (same shield in Family Part matters). We do so in this

summary judgment dismissing their complaint against defendants Palisades Regional Academy, Orange Board of Education, Sussex County Regional Transportation Cooperative and K&H Transport Inc., the bus company that ferried Stephanie to and from school.[2]  The trial judge determined the bus company owed no duty to plaintiffs "to protect against the alleged injury" — sexual assault — and that no reasonable person could find the bus company's actions caused plaintiff's injury.  We disagree, and reverse.

We recite the facts in a light most favorable to plaintiffs, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995), giving them "the benefit of the most favorable evidence and most favorable inferences drawn from that evidence," Estate of Narleski v. Gomes, __ N.J. __, __ (2020) (slip op. at 6) (quoting Gormley v. Wood-El, 218 N.J. 72, 86 (2014)).  The month

---

(continued)
civil action as the compelling interest in protecting Stephanie's identity is the same.

[2]  Although counsel for defendants K & H Transport, Inc. and K & H Transport LLC substituted as counsel for defendants Orange Board of Education, and Sussex County Regional Transportation Cooperative in the trial court and obtained summary judgment on behalf of each, its brief on appeal is filed only on behalf of the bus company defendants.  Plaintiffs amended their notice of appeal to include Palisades, but did not appeal from the February 2, 2018 summary judgment order in its favor, and Palisades has not participated in this appeal.

before these events, defendant Orange Board of Education conducted a triennial special education re-evaluation and social assessment of Stephanie, then seventeen-years-old and attending the eleventh grade at Palisades Academy, an out-of-district, State-approved school for students with disabilities. Stephanie was deemed eligible for continued special education due to a learning disability and social and communication deficits. Plaintiffs' expert reported that the re-evaluation and assessment scored Stephanie in the low range for general adaptive functioning, as well as communication and socialization skills. The evaluation also noted concerns by Mrs. H. that Stephanie was very trusting, lacked the ability to express her feelings and could be taken advantage of by people. Plaintiffs contend that Stephanie functions like a sixth or seventh grader. Reports in the appendices note Stephanie has been diagnosed with cerebral palsy and has a full-scale IQ of 77. Transportation to and from Palisades was part of Stephanie's Individualized Education Program (IEP).

On April 2, 2014, Stephanie got into a fight with a boy at school that upset her. When she got in the van that was to take her home, her regular driver claimed Stephanie told her she'd been in a fight and gotten suspended, and she didn't want to go home. Stephanie made a call on a cell phone, and the

driver overheard her say to the person she was speaking to, "wait for me, don't go, don't leave." When she got off the phone, Stephanie told the driver she had been speaking to her mother, who said it was okay that the driver drop her off at a cemetery near her apartment.[3] The driver testified at her deposition that she knew the children she drove were special needs students and had been warned by the owner of the bus company to be careful "because they look like normal children, but they have problems specific to them." The driver claimed she didn't "exactly know" what Stephanie's challenges were but had been told by the owner when she began driving Stephanie that "she was a special needs girl, that I would have to be very careful with her, very cautious."

Although the driver had Mrs. H.'s phone number, she did not call her to confirm what Stephanie had said, that she could drop Stephanie somewhere other than her home. The driver instead dropped Stephanie at the cemetery at about 2:45 p.m. and sent a text message to Mrs. H. to report she had done so.

---

[3] At her deposition, the driver testified that was not the first time Stephanie had asked to be let off at the cemetery. According to the driver, Stephanie had once previously told her she'd been in a fight at school and asked to be dropped off in front of the cemetery. On that occasion, the driver had telephoned the owner of the bus company, who "told [the driver], don't leave her there." After speaking to the owner, the driver dropped Stephanie at home.

She asked Mrs. H. to let her know if Stephanie wouldn't be at school the following day.

Stephanie had not called her mother. Instead, she'd borrowed a phone from the other student in the van and called a boy whose number she had written in a notebook, Stefon, to "meet up."[4] Stefon told her to meet him at Colgate Park, a fifteen-minute walk from her home. Stefon met her in the park, and the two walked to his house. A short while later, they left Stefon's and walked to the home of Stefon's friend, Najee.

When Mrs. H. picked up the bus driver's text shortly before 3:00 p.m., she called the driver. The driver told her about Stephanie using the other student's phone. Mrs. H.'s fiancé called the police to report Stephanie missing, and Mrs. H. dialed the numbers of friends of Stephanie's Mrs. H. found in Stephanie's room. Mrs. H. eventually got the name and number for the boy in the van. Mrs. H. called him to find the number her daughter had dialed when

---

[4] Although defendants refer to Stefon as Stephanie's "friend," she testified at her deposition only that she "had seen his face before." Stefon's phone number was one of four or five Stephanie had written in a notebook. She claimed they had "never talked," but she had seen him in the halls at a school she used to attend and said hi to him the year before in the company of others. She initially couldn't remember where she had gotten his number, but later recalled it was from a friend of her sister's. When asked why she chose to call Stefon, Stephanie replied,"[t]hat's the only person I knew around."

she borrowed his phone.  Calling that number, she reached Stefon, whom she did not know.  Stefon denied knowing Stephanie to Mrs. H., but afterwards told Stephanie her mother was looking for her, and that she should go home.

Stephanie left, but did not go home.  After Stefon told her she should go home, Stephanie borrowed the phone of one of the other boys and called Khalil, a boy she knew from eighth grade but hadn't spoken to in some time, to see if he would come get her, because she "didn't want to walk anywhere I didn't know or [with] people I didn't know."  Khalil was at work, however.  Explaining later that she "was still mad at the whole school thing" and "wanted to clear [her] mind out and just walk anywhere," she started walking to Montclair.  A car of three young men, one of whom she recognized as familiar from a school she used to attend, stopped, and the one she recognized, Abdul, asked where she was going.  She said she didn't know, she was just walking.  He asked if she wanted to go with them, and she got in their car.

The youths took her to Presley's house, where they went into the basement.  Stephanie had consensual sex in a closet with Abdul.  She was then sexually assaulted by Presley as well as one of the boys from the car.  The youths then took out their cell phones and took pictures of Stephanie naked.  She said she was confused, saw the flashes and asked if they were recording

her.  They told her they weren't recording, they were just trying to see her better.  Stephanie said she told them not to do that.

Police by then had responded to Mrs. H.'s home.  They followed her and her fiancé to Colgate Park, where friends of one of Stephanie's sisters reported seeing Stephanie with a boy.  They found Stefon, and police interviewed him.  Mrs. H. and her family canvassed the area, passing out flyers with Stephanie's picture.  Police issued an Amber alert.

Stephanie left Presley's house with the boys before dark.  The group drove to Steve's house, where Stephanie was serially raped by Abdul, Pressley, Steve and Steve's uncle.  She stayed the night at Steve's house.  The next morning, Steve had her stay in his car at school when he went to class.  He came out to the car around noon, and the two drove off.  Stephanie claimed Steve showed her a picture "that [she] was being looked for" on his phone, and "[h]e got kinda scared."  Steve eventually pulled the car over someplace in a downtown-like area and told Stephanie to get out.  Stephanie got out and "just started walking."  She didn't know where she was.

Happening on a bus stop, Stephanie got some change from a stranger and got on a bus.  She got off in Irvington in front of a thrift store.  She told the elderly owner "that I'm being — like I'm not home right now."  Stephanie said

A-0413-18T4

8

she didn't think the owner understood what she was saying, and told her he would call his daughter to come over and talk to her. The owner's daughter recognized Stephanie from the Amber alert and called the police. The police and Mrs. H.'s fiancé responded to the thrift store, and Mrs. H. met Stephanie at the police station. Stephanie did not immediately reveal the extent of her assaults, not telling anyone of the events at Steve's house. Although the police investigated, no charges were brought.

Plaintiffs submitted the report of an expert in educating and supervising special education students in opposition to the motion. The expert opined that the bus company was responsible to develop and implement policies and procedures, including the training and supervision of its drivers, to ensure the health and safety of the students it was responsible for transporting to and from school, and that it breached that duty by dropping Stephanie off at a location not assigned or approved by her school district or defendant Sussex County Regional Transportation Cooperative, which hired the bus company to transport Stephanie to school.

The expert also opined that defendant Orange Board of Education, Stephanie's resident school district, which was responsible for her safe transportation to and from school in accordance with the administrative code,

A-0413-18T4

9

breached the standard of care by failing to provide specific information or training, as per its own policies and New Jersey regulations, regarding Stephanie's needs and disabilities, recognizing that she was a vulnerable student with a disability and an IEP, who "required a higher level of care and supervision based upon her disability and deficits in the areas of communication and social skill development." The expert opined that the Board had a responsibility to ensure defendant Sussex Regional, a coordinated transportation services agency, to which it delegated the provision of Stephanie's transportation, and defendant bus company were provided specific information about Stephanie's disability, and that the bus company was responsible for properly training and supervising its drivers with that information in mind, which it failed to do. The expert also opined that notwithstanding that dereliction, the bus company was aware it was transporting disabled students, and failed to ensure its driver was aware that dropping off students with disabilities at unapproved locations was prohibited "and would foreseeably place students at risk of harm."

In urging its entitlement to summary judgment, the bus company argued plaintiff's allegations of rape "strain credulity" and her "voluntary sexual promiscuity" was not foreseeable, and thus there was no duty on the part of the

bus company to guard against her alleged injuries. It also argued that Stephanie "was not restricted because of any abnormal behavior." It noted that she was permitted to leave school at lunch, going to KFC or Papa John's. She walked to the park by herself, and she went to the mall and had keys to her apartment because "no one was at home when she arrived home from school." The bus company particularly emphasized that latter fact, because it insisted it showed that Stephanie would have gone to meet Stefon even if the bus driver would have insisted on dropping Stephanie at her home.

Indeed, when the bus company's counsel asked Stephanie at her deposition "if the bus driver had dropped you at home, would you still have been able to meet Stefon," she answered yes. Finally, the bus company argued that the driver dropping Stephanie two blocks[5] from her home was not the

---

[5] Although the parties agree that the van driver dropped Stephanie at "the cemetery," it is not clear from the record how close that was to Stephanie's home. The bus driver testified at deposition that it was "less than a block away," but she could not identify the place she left Stephanie when presented with a map showing both Stephanie's house and the cemetery, claiming she "really can't read maps." Mrs. H. testified there were "two cemeteries next to the house and [she was] not sure which one it was." Stephanie testified there was only one cemetery and it was "not far" from her home, maybe "three minutes." On the motion, plaintiffs admitted that Stephanie "believes her home is three minutes from the place where she was dropped off [the cemetery] by the driver" but denied that was "the actual time it would take to walk from the cemetery to [Stephanie's] home."

proximate cause of her alleged sexual assaults, making summary judgment appropriate.

Plaintiffs argued in opposition that Stephanie was not a "normal" seventeen-year-old, but instead was a mentally challenged, vulnerable girl, easily influenced by those who would take advantage of her. Plaintiffs contended Stephanie "had the mind of a sixth or seventh grader." They claimed the school district was aware of Stephanie's limitations, and the driver knew or should have known the danger that could befall Stephanie by dropping her any place other than her home, where a family member would be waiting for her. Plaintiffs stressed that someone was always at home to let Stephanie in after school, and that she didn't even have keys to her apartment on the day the bus driver dropped her at the cemetery.

Stephanie testified at deposition that she didn't have a cell phone, or carry a purse and didn't have a wallet or any money, even change, on the day she met Stefon in the park. Plaintiffs argued that sexual assault of vulnerable teens is hardly uncommon and was certainly foreseeable. They maintained the injuries to Stephanie were a direct result of the failure of the driver to drop her at her designated bus stop in front of her home.

After hearing argument, the trial court issued a written opinion granting the bus company's motion. The court began its opinion by noting that "[n]either party discusses [Stephanie's] learning disorder with the detail one might expect given its importance in this case as it regards . . . notice, foreseeability, duty, and the underlying allegations of rape." The court rejected out-of-hand the bus company's assertions that Stephanie's "voluntary sexual promiscuity," should factor into its decision on summary judgment, noting "that issue assumes a fact in dispute that would be properly left for the factfinder."

After setting out the facts and discussing the controlling case law as to the imposition of duty, most notably Jerkins v. Anderson, 191 N.J. 285, 289 (2007), where the court held "that schools in New Jersey must exercise a duty of reasonable care for supervising students' safety at dismissal," the court determined there was "nothing in the record to show that [Stephanie's] ability to appreciate risks is the same as that of a young child." The court noted she "was free to leave the Palisades school grounds at lunchtime with her friends to go to food serving businesses," and "went to the mall with friends unsupervised and had their phone numbers." The court concluded "[w]ithout something in the record demonstrating that her learning disorder diminishes

her ability to appreciate risks that come from unsupervised interaction with others, there would be no basis for a fact finder to determine that she is owed a larger duty than that of other teenagers."

The court went on to note that "[e]ven looking at cases where adults are considered to have diminished capacities to appreciate risks," such as Jensen v. Schooley's Mountain Inn, 216 N.J. Super. 79, 82 (App. Div. 1987), where we declined to hold a bar liable for the plaintiff's death when he fell from a tree and drowned after being served alcohol when visibly intoxicated, "the tortfeasor's duty is still limited by foreseeability." The trial court found that "[m]uch like how the defendants in Jensen would ordinarily have a duty to refuse to serve alcohol to someone who is visibly intoxicated, . . . defendants here might ordinarily have a duty to drop the students off at their homes." Relying on Jensen, however, the court concluded, "the alleged sexual assaults endured by plaintiff are fairly characterized as extraordinary consequences" that cannot be reasonably expected, and thus were outside the scope of the driver's duty of care.

The court reasoned that "[w]hile reasonably foreseeable consequences might include a child getting lost, walking in front of traffic, or go[ing] to a friend's house, it is an extreme circumstance where a seventeen-year-old would

be subjected to multiple rapes perpetrated by her peers and older men." Finding plaintiff's injuries were both "attenuated" and "bizarre," because "a student's being dropped off by a school bus two blocks away from her house does not ordinarily result in a series of sexual assaults," the court concluded those injuries "could not have been reasonably within the apprehension of defendant," and thus "the crucial element of foreseeability is missing."

The court also found that "[s]econdarily, foreseeability raises an issue for proximate cause." While recognizing that questions of proximate cause are ordinarily for the jury, Perez v. Wyeth Labs. Inc., 161 N.J. 1, 27 (1999), the court found "[t]his is one of those rare instances where the consequences of defendants' actions were so highly extraordinary that, as a matter of law, no reasonable factfinder could consider them to be naturally flowing from defendants' actions." Critical to the court's reasoning was Stephanie's own testimony at deposition "that even if the bus driver had dropped her off at home, she still will have been able to meet Stefon." The court concluded that although "the added distance may have delayed her by five minutes, it would not have prevented the sequence of events that led to plaintiff's alleged injury."

The court finally found that "[e]ven if defendants' action was causally related to plaintiff's injuries," those injuries "cannot be considered to naturally

flow from . . . defendants' conduct." Specifically, the court noted plaintiff's injuries didn't occur "as a result of plaintiff's meeting up with Stefon at the cemetery where she was dropped off." It stated:

> [a]fter leaving the bus, plaintiff met Stefon and went to his home. At that point she was totally safe. From there, after the passing of some time, plaintiff and Stefon went to the home of Najee . . . . Again, she was safe. She then left Najee's home and began to walk again and was within walking distance of her home had she chosen to go home. However, plaintiff chose not [to] go home but to continue walking.

The trial court concluded no reasonable person could find defendants' action in not dropping Stephanie at her home caused her injuries. The court noted

> [t]his was an incredibly long sequence of events that separated the alleged injuries from defendants' action of dropping [Stephanie] off two blocks away from her home at 2:45 in the afternoon. Not only did the alleged injuries take place in a location three times removed from where she was dropped off, but they were also directly caused by third parties whom the bus driver was unaware of. One would be hard pressed to find that this intricate series of events was one that naturally flowed from defendants' action and should have been anticipated by the bus driver.

Plaintiffs' appeal, reprising their arguments to the trial court, and adding that the court failed to view the facts in the light most favorable to them and in

determining that no genuine issue of material fact exists as to whether the defendants' negligence was the proximate cause of Stephanie's injury.

We, of course, review summary judgment using the same standard that governs the trial court. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012). Our function, like the trial court's, is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); R. 4:46-2(c). We are not to afford the trial court's determination that a party is entitled to summary judgment as a matter of law "special deference," but instead review the question de novo. Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016).

This is not an easy case. The trial court's thoughtful opinion, which we have quoted at some length, reflects the difficulties presented. As the trial court correctly acknowledged, the existence and scope of a tort duty are legal questions. Broach-Butts v. Therapeutic Alts., Inc., 456 N.J. Super. 25, 34 (App. Div. 2018); see also Estate of Narleski, __ N.J. at __ (slip. op at 17) (noting "[t]he recognition or establishment of a legal duty in tort law is generally a matter for a court to decide" (quoting Acuna v. Turkish, 192 N.J. 399, 413 (2007))). The Supreme Court has instructed that in determining

whether a duty exists, "the court must first consider the foreseeability of harm to a potential plaintiff . . . and then analyze whether accepted fairness and policy considerations support the imposition of a duty." Jerkins, 191 N.J. at 294 (citations omitted).

The Court has explained that "[f]oreseeability as a determinant of a business owner's duty of care to its customers is to be distinguished from foreseeability as a determinant of whether a breach of duty is a proximate cause of an ultimate injury." Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 502-03 (1997). "Simply put, the distinction is between foreseeability as it impacts on duty determination and foreseeability as it is sometimes applied to proximate cause — a critical distinction too often (because too easily) overlooked." Hill v. Yaskin, 75 N.J. 139, 143 (1977). As the Court instructed in Hill, "[t]he risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care."[6] Id. at 144 (citation omitted). "The broad test of negligence is

---

[6] In Hill, the plaintiff, a police officer injured in a collision with a thief driving a stolen car, sued the parking lot from where the car was stolen and the car's owner, alleging the lot's practice of leaving the ignition key inside the unlocked car in a high crime area in Camden when it closed at 5:00 p.m., and

(continued)

the owner's failure to retrieve her car during operating hours was negligent and resulted in his injuries. 75 N.J. at 140-41. The trial court granted summary judgment to both defendants, and we affirmed. Id. at 140. We reasoned "that the lot operator had the right to conduct its business during certain hours and that neither the 5:00 P.M. closing time nor the arrangement to leave the keys to accommodate late customers could be 'considered in the context of a breach of duty to a third party stranger injured by the intervening act of a felon.'" Id. at 142 (quoting our opinion at 138 N.J. Super. 264, 269 (App. Div. 1976)). As to the owner, we found the owner of a stolen car "is not liable for the consequences of the negligent acts of a thief merely because he parked his car with the key therein." Ibid. (quoting 138 N.J. Super. at 268). The Supreme Court reversed, having "no hesitancy in concluding that summary judgment should not have been entered in favor of either defendant." Id. at 145.

The Court found the lot's location in a high crime area and its history of vandalism made clear "the unreasonably enhanced hazards attendant upon the defendant lot's method of operation," resulting in a duty "to protect users of the highways from the action of a thief who uses the keys left in the vehicle to mobilize it and then to operate it in a negligent fashion, resulting in plaintiff's injuries." Id. at 146. The Court found nothing in the summary judgment record to suggest the likelihood of theft and the officer's subsequent injuries was any less foreseeable by the owner than the operator of the parking lot. Id. at 147. It found

> nothing unfair in requiring defendants to go to trial on . . . whether they should have foreseen that the leaving of Yaskin's automobile unattended under the circumstances . . . unreasonably increased the hazard of its theft and subsequent mishandling — particularly where that hazard could have so easily been substantially reduced, if not entirely eliminated, by resort to the extra set of keys, a minimal burden at worst.
>
> [Id. at 148.]

what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances." Ibid.

Foreseeability as it relates to proximate cause, "on the other hand, relates to 'the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff' reasonably flowed from defendant's breach of duty." Clohesy, 149 N.J. at 503 (quoting Hill, 75 N.J. at 143). In other words, "[f]oreseeability in the proximate cause context relates to remoteness rather than the existence of a duty." Ibid.

We have no hesitation in determining the bus company owed a duty of reasonable care to Stephanie and her mother to deliver Stephanie safely home from school.[7] We cannot imagine how it could be otherwise. As the Court has observed, "parents entrust their children to the care of schools, and '[e]ducators have "[n]o greater obligation . . . than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or

_____

[7] We held in Jackson v. Hankinson "that the rule of care such as a reasonable person of ordinary prudence would exercise under the circumstances is equal to the demands of justice in a school bus case, particularly if the trial court points out that the amount of care called for under that standard may be higher than ordinarily if the particular circumstances present special hazards." 94 N.J. Super. 505, 512 (App. Div. 1967) (citing Ambrose v. Cyphers, 29 N.J. 138, 144 (1959); Hunter v. Boyd, 28 S.E.2d 412, 414 (S.C. 1943)), aff'd, 51 N.J. 230, 233 (1968).

intentional transgressions of others."'" <u>Jerkins</u>, 191 N.J. at 296 (quoting <u>L.W.</u> <u>v. Toms River Reg'l Schs. Bd. of Educ.</u>, 189 N.J. 381, 406 (2007)).

The Supreme Court has plainly held that "school authorities are obligated to take reasonable precautions for [the] safety and well-being" of school children, and "[w]here . . . they have provided transportation to and from school in a school bus (R.S. 18:14-8) [now N.J.S.A. 18A:39-1] their obligation continues during the course of the transportation." <u>Jackson v.</u> <u>Hankinson</u>, 51 N.J. 230, 235 (1968). Transportation services were a part of Stephanie's IEP, and defendant district contracted with defendant Sussex Regional, which in turn contracted with defendant bus company to transport Stephanie from her home in Orange to Palisades Academy in Paramus and back. There is no question but that those defendants had a duty to "take reasonable precautions for [Stephanie's] safety and well-being" in providing that transport.[8] <u>Ibid.</u>

---

[8] Counsel for the bus company conceded at oral argument that the bus company had a duty to see Stephanie safely home, although he characterized it as arising out of contract, not tort.

The difficult question on this record is not the existence of the duty but its scope.[9]  Specifically, whether unwanted sexual contact, by young men from whom she willingly accepted a ride, was a risk reasonably within the range of apprehension of injury Stephanie might suffer from being dropped off unsupervised somewhere other than her home.  The trial judge decided the answer to that question was no.  Relying on our opinion in Jensen that "legal responsibility for the consequences of an act cannot be imposed without limit," 216 N.J. Super. at 82, the judge characterized what happened to Stephanie as "bizarre," and "attenuated," and thus not reasonably foreseeable by defendants.

---

[9]  In that regard, the issue in this case is similar to the one presented in Jensen, 216 N.J. Super. at 82, where we recognized that bar owners have a duty of reasonable care not to serve intoxicated patrons, yet still held that the plaintiff's death by drowning after falling from a tree could not "reasonably be expected to follow from serving alcohol to one who is visibly intoxicated" and thus found no duty.  Stated differently, protecting visibly intoxicated patrons from climbing trees and drowning was beyond the scope of the duty the bar owed to its patron.  That a visibly intoxicated patron would leave the bar, climb a tree and drown was simply not a risk reasonably within the range of apprehension of injury that could befall the patron.  Defendants clearly owed a duty to Stephanie and her mother to transport Stephanie safely home from school, just as the bar owed a duty in Jensen not to serve visibly intoxicated patrons.  The issue, as in Jensen, is the scope of that duty, that is, whether protecting Stephanie from sexual assault by young men she encountered after being dropped off unsupervised blocks from the designated spot outside her door, was within or outside the scope of the duty the bus company owed Stephanie and her mother.

We conclude the answer to the question, and thus the scope of the duty in this case, that is, "foreseeability as a 'duty' determinant," Hill, 75 N.J. at 144, is impacted by the extent of Stephanie's disability,[10] and that the trial court erred in resolving that question on disputed facts.

Specifically, the trial court found the risk of harm to Stephanie, a seventeen-year-old girl, "was much less than that facing [the] nine-year-old student" in Jerkins. We think it more accurate to say the risks were different. The risks here were not "a child getting lost" or "walking in front of traffic" as could occur to a nine-year-old unsupervised at school dismissal. The alleged harm to this special needs seventeen-year-old, dropped off somewhere other than her home, was sexual assault — because, left alone and unsupervised, she allegedly failed to appreciate the risk of getting in a car with three young men,

---

[10] A different example may better illustrate the point. Consider that a bus driver is transporting Alzheimer's patients home from a senior citizen's daycare program, one of whom the driver drops a few blocks distant from the designated spot outside her home where a family member would be waiting. While the patient might be physically capable of traversing the distance, it is easy to foresee the risks the patient's Alzheimer's poses to her doing so safely. Because a defendant's duty is measured by the scope of the risk of dangerous consequences to the plaintiff, and because probable harm to the Alzheimer's patient is likely enough that a reasonably prudent driver ought to take it into account, the risk of harm dictates that the driver take steps to avoid it by dropping the patient at the designated location. Failure to do so creates or increases the risk of hazard.

none of whom she actually knew, who found her walking aimlessly and asked if she wanted to get in their car and go with them.

So, the question of scope of duty on this record, was whether it was reasonable for the van driver to have realized that leaving Stephanie, alone and unsupervised, somewhere other than at her home could well result in her meeting up with young men who would take advantage of her limited intellectual functioning and acquiescent nature to engage her in unconsented sexual contact.

The trial court wrote in its opinion that plaintiffs argued that Stephanie "should be owed the same duty as that owed to a young child because she has special needs." It then found "nothing in the record to show her ability to appreciate risks is the same as that of a young child." But plaintiffs didn't argue that Stephanie had the mind of a "young child." That was defendants' "straw man" characterization of plaintiffs' argument. Plaintiffs actually argued that Stephanie was not "a normal seventeen-year-old," and "had the mind of a sixth or seventh grader," that is, a twelve- or thirteen-year-old adolescent. After noting that Stephanie was free to leave school grounds at lunch and "went to the mall with friends unsupervised," the court concluded that "[w]ithout something in the record demonstrating that [Stephanie's] learning

A-0413-18T4

24

disorder diminishes her ability to appreciate risk that come from unsupervised interaction with others, there would be no basis for a fact finder to determine that she is owed a larger duty than that of other teenagers."

The extent of Stephanie's disability and the degree to which she was permitted out unsupervised, however, were hotly contested on the motion. Although we certainly agree with the trial court that "[n]either party discusse[d] [Stephanie's] learning disorder with the detail one might expect given its importance in this case as it regards . . . notice, foreseeability, duty, and the underlying allegations of rape," we cannot agree there was nothing in the record that Stephanie had a "diminishe[d] . . . ability to appreciate risks that come from unsupervised interaction with others."

Plaintiffs asserted several facts that spoke to Stephanie's diminished capacity in that regard; among them: the defendant school district's special education re-evaluation and social assessment of Stephanie the month before these events that found she continued to be eligible for special education due to a learning disability and social and communication deficits; Stephanie's low scores in general adaptive functioning, communication and socialization skills; the reports that she "only at times demonstrated socially acceptable behaviors" and was "easily influenced and followed the examples of others without

thinking"; and the concern Mrs. H. expressed to district officials <u>before these events</u> that Stephanie "would get hurt because she was very trusting, lacked the ability to express her feelings, and could be taken advantage of."

In addition, plaintiffs insisted that someone walked Stephanie downstairs to the bus in the morning or watched her from the windows, and that a family member was there every afternoon when she got off the bus because she required that degree of supervision. Defendants disputed that Stephanie was supervised that closely or that she required that level of supervision. While plaintiffs admitted that Stephanie was permitted to go off campus at lunch, they pointed to facts establishing it was done under close supervision, that is only on occasion when permitted by teachers for good behavior, and then only for the limited lunch period.

We agree with plaintiffs that the sexual exploitation of developmentally disabled girls by their peers happens, unfortunately, too regularly to be beyond the risks "reasonably within the range of apprehension," <u>Hill</u>, 75 N.J. at 144, of those responsible for their care. <u>See, e.g.</u>, <u>L.E. v. Plainfield Public School District</u>, 456 N.J. Super 336, 348 (App. Div. 2018) (collecting cases) (high school freshman girl sexually assaulted by two classmates during school day), <u>certif. denied</u>, 236 N.J. 627 (2019); <u>State v. Scherzer</u>, 301 N.J. Super. 363, 393

(App. Div. 1997) (seventeen-year-old sexually assaulted by peers she had "known…since grade school"); In re L.Q., 227 N.J. Super 41, 43-44 (App. Div. 1988) (fifteen-year old victim of sexual abuse by teacher). We have specifically held, albeit after the trial court's decision in this case, "that school personnel's supervisory responsibilities may extend to the prevention of unwanted sexual encounters between students," and that "[a] jury could reasonably find that the risk of sexual misbehavior among high school teenagers was foreseeable." L.E., 456 N.J. Super. at 348, 350.

To be clear, however, we do not hold that the "probable harm to one in the position of this injured plaintiff," an allegedly developmentally disabled seventeen-year-old dropped off unsupervised at a location other than her home, "should reasonably have been anticipated from defendant's conduct." See Hill, 75 N.J. at 143. There is too little that is undisputed in this record about Stephanie's condition to allow the court to have determined, as a matter of law, the scope of the duty owed to her, and specifically, whether her sexual assault was a risk reasonably within the range of apprehension of injury she might suffer from being dropped off at the cemetery, blocks from the designated bus stop directly outside her door.

While it will, of course, ultimately be plaintiffs' obligation to establish the scope of the duty, along with its breach, proximate cause and damages, Polzo v. County of Essex, 196 N.J. 569, 584 (2008), defendants attempted on this motion to establish Stephanie's injuries were beyond the scope of any duty they owed. They did so, however, not by accepting the facts alleged by plaintiffs about Stephanie's condition, but by arguing that Stephanie's "voluntary sexual promiscuity" was something "no rational mind could have foreseen," and that plaintiffs' argument to the contrary "is based on the false premise that plaintiff was a three-year-old rather than a seventeen-year-old who was clearly in control of where she went and with whom." Examined in this light, it is obvious that defendants' argument on foreseeability — that "[m]ost seventeen-year-old students do not voluntarily have consensual sex with one person in the presence of other males and then stay with a group of males after the alleged rape" — proves too much. The critical issue is that the parties disputed whether and to what extent Stephanie was a "normal" seventeen-year-old and whether she had a "diminishe[d] . . . ability to appreciate risks that come from unsupervised interaction with others."

We are satisfied plaintiffs could point to enough facts in the record to put the extent of Stephanie's disability in issue on the motion. Because the

scope of the duty defendants owed to Stephanie could not be established on the motion, because the parties disputed facts material to its determination, any discussion of whether breach of the duty was a proximate cause of Stephanie's injuries was premature. One cannot judge remoteness until the scope of the duty is clear.[11] See Hill, 75 N.J. at 147 ("Once we acknowledge conceptually the existence of a duty predicated on foreseeability of an increased hazard of theft and subsequent mishandling of an automobile, it should then become the jury's task to determine whether . . . that duty was violated by defendant Yaskin and her conduct . . . a substantial causative factor in the plaintiff's injury."). Accordingly, the court was not free to decide, at this juncture, as a matter of law, that the sexual assaults Stephanie suffered were "so highly extraordinary a result" of dropping Stephanie unsupervised at a place other than her home that the bus company could not be liable for those injuries. See

---

[11] Here, for example, without knowing the scope of the duty owed to Stephanie based, in part, on the extent of her disability, one cannot know whether the trial court was correct to posit that she was "safe" at Stefon's house, a boy she claimed never to have conversed with before and one who denied knowing her to Mrs. H. If Stephanie's disability was such that she should not have been left unsupervised with peers, for instance, a jury might determine that Stephanie never got to a "safe" place after the van driver left her alone at the cemetery, and that her sexual assault at Presley's house "reasonably flowed from defendant's breach of duty." Clohesy, 149 N.J. at 503.

Caputzal v. Lindsay Co., 48 N.J. 69, 79 (1966); Broach-Butts, 456 N.J. Super. at 41.

Because the scope of the duty owed to Stephanie is impacted by the extent of her disability, and the facts necessary to that determination were vigorously contested, summary judgment was inappropriate on this record. On remand, the judge will have to decide, either on an undisputed factual record on a renewed motion, or after hearing evidence at trial, whether the bus driver had a duty, which a jury might determine from the evidence was breached, to take steps to protect Stephanie from unsupervised contact with peers who would take advantage of her limited intellectual functioning and acquiescent nature to engage her in unconsented sexual contact. See Estate of Narleski, __ N.J. at __ (slip op. at 32) (discussing four factors underpinning a determination of duty: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution" (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993))).

Once the court determines the scope of the duty, that is, whether the driver's duty to convey Stephanie safely home[12] encompassed an obligation to take steps to protect her from unsupervised contact with peers who would draw her into unconsented sexual contact, L.E., 456 N.J. Super. at 348, it will then be for the jury to determine whether the bus driver's leaving Stephanie at the cemetery instead of at her door breached that duty by creating or increasing the hazard to her.[13]

If the jury finds the bus driver breached her duty to Stephanie, plaintiffs will still have to convince the jury that leaving Stephanie at the cemetery was a substantial causative factor in her injuries, and that Stephanie's decision to

---

[12] Plaintiffs maintain "[s]chool districts designate particular bus stops," here plaintiffs' exact address in accordance with her Special Education Transportation Form, "for the safety of students," in part by providing parents notice of where the child will be dropped off. They do not argue that the driver's obligation to see Stephanie "safely home" included any duty to ensure she got safely inside. Plaintiffs acknowledge that once the driver drops the student at the designated spot, "it becomes the guardian's responsibility to ensure the student's safety." Plaintiffs' argument is simply that it is the driver's "duty to protect students until a student's parent has the ability to reassume control over the student's protection" when the child is dropped at the designated stop, here, outside her home.

[13] Although proximate cause is ordinarily a jury question, Perez, 161 N.J. at 27, we do not preclude the judge deciding that no reasonable jury could find plaintiff's injuries were proximately caused by the bus driver's acts, Vega by Muniz v. Piedilato, 154 N.J. 496, 509 (1998), after the scope of the duty is established.

walk to Montclair instead of home after leaving Najee's house and getting in the car with Abdul and others were not "intervening cause[s] that broke the chain of causation linking defendants' conduct to plaintiff's injury." Cowan v. Doering, 111 N.J. 451, 460 (1988) (discussing proximate and intervening causes where the plaintiff is mentally disabled and "not capable of adhering to a reasonable person's standard of self-care"). Of course, the extent of Stephanie's disability is likely to inform any determination of proximate cause, as well as any finding of comparative negligence on her part. See Berberian v. Lynn, 179 N.J. 290, 297-98 (2004) (noting Cowen's capacity-based standard for mentally-disabled plaintiffs is congruent with the Court's recognition "that a child's conduct should be measured in light of his or her capacity to exercise care under all attendant circumstances").

We reverse the entry of summary judgment to defendants, other than Palisades, and remand for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0413-18T4